THE STATE, DEFENDANT IN ERROR, v. HENRY PULLEY, PLAINTIFF IN ERROR.

Submitted November 21, 1911—Decided March 4, 1912.

1. It is not error for a judge, in charging the jury in a case of criminal homicide, to state the impression which testimony on a given point makes upon his mind; nor is it legally objectionable for him to express his opinion as to the degree of the prisoner's crime under the evidence in case the jury shall find him guilty.

2. It is not open to the jury in a case of criminal homicide to find the prisoner guilty of involuntary manslaughter when the case is barren of any proof tending to support such a finding.

3. The use of the word "murder," in the charge to the jury, to indicate the crime of murder in the second degree, the distinction between the two degrees of murder having been already explained to the jury and the meaning of the judge in using the word being apparent to them, does not constitute legal error.

4. Declarations of a party as to the subject-matter of the controversy which are contradictory of statements made by him upon the

witness-stand, are competent to be proven as a substantive matter without first calling his attention to them while he is upon the stand.

On error to Monmouth Oyer and Terminer.

For the plaintiff in error, *John W. Slocum* and *William L. Edwards*.

For the state, *John S. Applegate, Jr.,* prosecutor of the pleas.

The opinion of the court was delivered by

GUMMERE, CHIEF JUSTICE. The defendant was indicted by the grand jury of Monmouth county for the crime of murder, the felonious act being the killing of his wife by shooting her with a revolver. The trial of the defendant on the indictment resulted in a verdict finding him guilty of murder in the first degree; and the validity of the judgment entered upon that verdict is now attacked for errors asserted to have been committed by the court below at the trial. With one exception, the alleged errors are to found in the charge to the jury. In order to understand the bearing of the portions of the charge which are complained of, a brief recital of the testimony in the cause is necessary.

The defendant, with his wife, occupied the lower portion of a house at Long Branch. On the evening of the shooting two friends of his wife (Jennie Carter and Arthur Berry) called at her home to see her. They arrived about ten o'clock, and remained until about twelve. At the beginning of the visit the defendant was not at home, but came in shortly before midnight, accompanied by one Mary Matthews, who lived in the upper portion of the house, being a tenant of the defendant. According to the testimony introduced by the state, the defendant, as they entered the room, was demanding unpaid rent from the Matthews woman, who referred him to her husband for its payment. The defendant was admittedly intoxicated, but was able to walk straight. He went through the room in which the visitors were sitting

into the bedroom, which adjoined it, and then came back. Upon his return to the room where his wife and her guests were sitting, he asked her to move a baby carriage which stood between him and a box upon the top of which his revolver was lying. This she refused to do, and, having addressed an obscene remark to her, he moved the baby carriage himself and took his revolver from the top of the box. He then began pointing it about the room, snapping it twice as he did so, and saying: "I want to see if it will go off." The second time it was snapped it was pointed at Berry; but on neither occasion did it explode. Berry asked the defendant if the gun was loaded, and he replied that it was. Berry then said, "Don't point it this way," to which the defendant answered that he would turn it any way he wanted and shoot anything (or at everything) in there. The above recital of facts is taken from the testimony of Berry and Jennie Carter, who were produced as witnesses by the state. Almost immediately after this last remark of the defendant both of these witnesses ran out of the house into the yard, and to the front gate. Just as they reached the gate they heard the report of defendant's pistol. Mary Matthews, who remained in the room until after the shooting occurred, and who also testified in behalf of the state, said that after Berry and Jennie Carter went out the defendant's wife got up from her seat and stood in front of the defendant; that he was then standing in the doorway between the two rooms, and that they were about two feet apart; that, as his wife stood in front of him, he said, "I am going to shoot;" that when he said that the gun was pointed at her, and was immediately discharged; that she threw up her hands and said, "I am shot," and then fell. Immediately after the shot was fired the Matthews woman, she says, "went out the door."

The defendant offered himself as a witness in his own behalf, and his story of the shooting is as follows: Upon his return home he saw the man Berry sitting near the box upon which his pistol lay; thinking that Berry was likely to take the gun, he went to the box and got it himself, and started toward the bedroom with it. His wife followed him, and

shoved him, and grabbed his hands, and made two or three "wrings" on the gun, and said, "You are not going out no more." He replied, "I ain't going out." She then made another "wring," and the gun went off and shot her. He denied that he had pointed the pistol at either Berry or Jennie Carter. He also denied that he had pointed it at his wife, and declared that he had no intention whatever of shooting her.

The defendant's revolver was found by the police at his home about two hours after the shooting. It contained two empty cartridges, one of which, from its corroded condition, appeared to have been discharged some time previously; the other apparently had been freshly discharged. It also contained three loaded cartridges, two of which showed indentations which appeared to have been made by the striking of the hammer of the pistol upon the cartridges.

Upon the proof submitted, the trial judge instructed the jury that if they believed the shooting occurred in the way described by the defendant, without any intention on his part to inflict bodily harm, or to kill, then it was their duty to acquit. He then instructed them that if they did not believe the story of the defendant as to how the shooting took place, they should then take up the consideration of the question whether the defendant discharged the pistol with intent to kill or to do serious bodily harm, and then explained to them what constituted murder in the first degree, what murder in the second degree was, and what constituted the crime of voluntary manslaughter, concluding his statement with relation to the latter crime with the remark that "There would seem to be no middle ground in this case which would reduce the crime from murder in the second degree to that of manslaughter." He concluded his charge as follows: "If you find the defendant guilty, you must designate in your verdict of what degree you find him guilty, whether of the first degree, or of the second degree, or of manslaughter; although, as I have said to you, I see no reason why you should find him guilty of manslaughter.

It should either be an acquittal, or a conviction of murder, or murder in the first degree."

The principal criticism upon the charge is directed at the statement of the trial judge following the definition of voluntary manslaughter, that there would seem to be nothing in the case which would reduce the crime from murder in the second degree to manslaughter; and the concluding portion of his instruction, which has just been cited. It is argued that the effect of these portions of the charge was to coerce the jury, in case they should find the defendant guilty, into convicting him of murder, by taking away from them any consideration of the question whether he was guilty of manslaughter.

We think this criticism upon the charge is unsubstantial. The trial judge specifically instructed the jury that, if they found the defendant guilty, they must designate in their verdict the degree of his guilt; "whether of the first degree, or of the second degree" (referring, manifestly, to the crime of murder), "or of manslaughter." His statement, immediately following that instruction, viz., "although, as I have said to you, I see no reason why you should find him guilty of manslaughter," was plainly a mere declaration of the impression which the testimony had made upon his mind upon this point, and the conclusion drawn by him from it. The propriety of such action by a trial judge in a criminal case is entirely settled by our decisions. *State* v. *Hummer,* 44 *Vroom* 714; *State* v. *Schuyler,* 46 *Id.* 487. The words following this expression, namely, "It should be either an acquittal, or a conviction of murder, or murder in the first degree," is a mere amplification of what directly preceded it—an expression of what, in the opinion of the judge, the verdict of the jury ought to be in case of a conviction; not an attempt to control them in the exercise of their function. It is a declaration of what, in the opinion of the judge, their verdict ought to declare, under the evidence, in case of a conviction; not what it must declare as a matter of law.

It is further argued that, conceding the effect of the charge to be as above indicated, nevertheless the jury was only per-

mitted to find the defendant guilty of manslaughter as that crime had been explained by the judge in the earlier portion of his charge; in other words, that it merely allowed them to declare him guilty of voluntary manslaughter, and took away from them any consideration of the question whether his offense, if he was guilty, was or was not that of involuntary manslaughter.

It is not necessary to consider the soundness of this contention. Assuming that it expresses the fair intendment of the charge, the only theory upon which a verdict of involuntary manslaughter could be supported, *by the proofs in the cause,* is that the shooting occurred substantially in the way described by the defendant himself upon the witness-stand. But the error of the trial court, in not permitting the jury to find such a verdict, upon such a theory, if it be an error, was beneficial, not harmful, to the defendant, for the instruction was that, if the jury believed the story told by him, they should acquit him. But the counsel of the defendant do not attempt to support their contention upon this ground. Their claim is that it was open to the jury to disregard the story told by the state's witness Matthews, and also that told by the defendant himself, and to find that the defendant, after the departure of Jennie Carter and Arthur Berry from his house, continued to brandish and snap his pistol in the reckless way described by them, not fully appreciating, by reason of his intoxicated condition, the danger of so doing, and unintentionally discharged it, with the fatal result which followed. The complete answer to this contention is that such a finding would rest, not upon any proofs in the cause, but upon mere conjecture. If the version of the homicide told by the witness Matthews was rejected by the jury, then the case against the defendant failed altogether, and he was entitled to an acquittal, for absence of proof showing the circumstances under which the homicide occurred, plus the perjury of the defendant upon the witness-stand, can never be accepted as a fulfillment by the state of its obligation to satisfy the jury beyond a reasonable doubt; by the proofs in the cause, that death was produced

by the *criminal* act of the defendant. And so where, in a case like this, there are but two versions of the homicide, the one showing that the defendant is guilty of the crime of murder, and the other showing him to be innocent of the charge made against him, the trial judge is entirely justified in telling the jury that the defendant, if guilty at all, is guilty of murder, and not of manslaughter. Such is the legal rule declared by the Supreme Court in *State* v. *Biango,* 46 *Vroom* 284; and that rule was expressly approved by this court on review. *S. C., on error,* 50 *Id.* 523.

It is further asserted on behalf of the defendant that by instructing the jury that if they found the defendant guilty they should convict him either "of murder, or murder in the first degree," the trial judge excluded from their consideration murder in the second degree as well as manslaughter, because (in the language of the brief of defendant's counsel) "he did not at that time or at any other time, explain to the jury the distinction—or that there is any distinction—between 'murder' and murder in the first degree." That the trial judge intended, by the use of the word "murder," to denote murder in the second degree, and that the jury so understood him, cannot be doubted. The context makes this perfectly plain. The distinction between murder in the first degree and murder in the second degree had previously been carefully indicated by him. Under these circumstances, the failure to follow the nomenclature adopted by the statute, in speaking of a conviction of the minor offence, did not constitute error. *State* v. *Gruff,* 39 *Vroom* 287.

The other criticism upon the charge, contained in the assignments of error and reasons for reversal, have each received consideration by us. They are not of sufficient legal importance to justify discussion here. It is enough to say that we find them, one and all, to be without merit.

The only ground of reversal not rested upon alleged errors in the charge to the jury relates to evidence produced by the state upon rebuttal, and admitted over the objection of the defendant. The evidence objected to was the testimony of a police officer that the defendant, an hour or two after

his arrest, stated to the witness that his (defendant's) wife had shot herself. The ground upon which the objection to this evidence was rested, and upon which its illegality is asserted before us, is that there was no denial by the defendant on the witness-stand that he had made such a statement; and that it is a settled rule of evidence that such a denial is necessary in order to render the testimony competent. The rule appealed to prevails only where the witness is not a party to the litigation. Declarations of a party, as to the subject-matter of the controversy, which are contradictory of statements made by him upon the witness-stand, are competent to be proven, as a substantive matter, without first calling the party's attention to them while he is on the witness-stand. *McBlain* v. *Edgar, 36 Vroom* 634. The evidence under consideration was therefore properly admitted by the trial judge.

No reason appearing for the reversal of this judgment, it must consequently be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BOGERT, VREDENBURGH, VROOM, CONGDON, WHITE, TREACY, JJ.   15.

*For reversal*—None.