STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. JAMES ARTHUR WILLIAM JONES, ALIAS JAMES WILLIAMS, ALIAS JAMES ARTHUR JONES, PLAINTIFF IN ERROR.

Argued February 5, 1935—Decided June 13, 1935.

For the plaintiff in error, *Isidore Kalisch.*

For the state, *William A. Wachenfeld,* prosecutor of the pleas, and *Joseph E. Conlon,* assistant prosecutor.

The opinion of the court was delivered by

PARKER, J. This is a writ of error to a conviction of murder in the first degree without recommendation of life imprisonment.

A number of points are made for reversal, but we find it unnecessary to decide at this time any but the first, which, in our judgment, points clearly to harmful error committed by the trial court.

Defendant is a negro. Before the jury was selected from the special panel of forty-eight, provided by law to be selected from the general panel (Criminal Procedure act, section 82, *Comp. Stat., p.* 1847) defendant challenged the array, in writing, "because those charged by the State of New Jersey and county of Essex with the duty of drawing such panel

deliberately avoided calling any persons of the colored race knowing that the defendant was colored and because of bias and prejudice against such defendant and this challenge to the array this defendant demands that the court try."

This challenge was peremptorily denied by the court, and exception duly prayed and sealed.

This denial was error. In *State* v. *James, 96 N. J. L.* 132 (at *p.* 143), the late Chancellor Walker, speaking for this court, remarked *obiter:* "It was long ago held that where colored men were not summoned and returned on jury panels, members of that race could raise the objection that they were discriminated against." See, also, *State* v. *McCarthy, 76 Id.* 295, 298. It is settled in the Supreme Court of the United States, the final authority in matters of this kind, that "whenever by any action of a state, whether through its legislature, through its courts, or through its executive or administrative officers, all persons of the African race are excluded, solely because of their race or color, from serving as grand jurors in the criminal prosecution of a person of the African race, the equal protection of the laws is denied to him, contrary to the fourteenth amendment of the constitution of the United States." *Norris* v. *Alabama, 55 Sup. Ct. Rep.* 579; *79 L. Ed.* 598, quoting *Carter* v. *Texas, 177 U. S.* 442, and citing other cases. As the trial court in the present case refused to make any inquiry into the allegations of fact set up in the challenge, it must be assumed for present purposes that they would have been substantiated if tried or at the very least, the defendant was deprived of his right to produce evidence to substantiate them.

The foregoing, as premised, suffices for a reversal: but as the case must be retried, some comment on the other phases of the case may well be in order. And first, of certain inconsistent rulings of the court in respect to defendant's demand of particulars. The indictment was in the common statutory form, which in itself specifies little or nothing, merely alleging that defendant, on, &c., at, &c., in the county of Essex did willfully, feloniously and of his malice aforethought, kill and murder John Magin, contrary to the form of the statute, &c. The evidence as it came in

tended to show that the defendant in the night time broke into a cleaning and dyeing plant, wherein deceased was employed as night watchman; that defendant was provided with a drill and explosive material with intent to "blow" the safe, was discovered and challenged by deceased, beat him over the head with a piece of iron pipe until his skull was crushed in, went through his pockets, appropriated some articles of clothing belonging to customers, and left without getting into the safe. The demand for particulars asked, among other things, for information as to whether the state would claim murder in the commission of a burglary, or murder in the commission of a robbery: and if the former, whether the "burglary" was that referred to in section 106 of the Crimes act (*Comp. Stat., p.* 1779) which simply uses the word "burglary"—as also does section 107—or that referred to in section 131 (*Comp. Stat., p.* 1787) which in its text (the black letter word "burglary" is no part of the statute as enacted but is merely an editorial caption) provides that "any person who shall, by night, willfully or maliciously break and enter any church, meeting house, dwelling house, shop, warehouse, mill, barn, stable, outhouse, railway car, canal boat, ship or vessel, or other building whatever, with intent to kill, rob, steal, commit rape, mayhem or battery, and his counselors, procurers, aiders and abettors, shall be guilty of a high misdemeanor." There being some doubt about the entry being made in the night time, the defendant asked that the state give the hour at which it would contend the offense was committed.

The demand for particulars was in writing, and in six numbered paragraphs. The court ruled that the state was not bound to furnish a bill of particulars. The correctness of that ruling we need not presently discuss, as the prosecutor said there was no objection to answering numbers 4 and 6, the court accordingly directed that they be answered. This seems to have been done, but orally; and defendant seems to have been content with it.

Numbers 4 and 6 are as follows:

"4. If the state will contend at the trial that the alleged killing occurred by reason of the defendant's committing or

attempting to commit burglary as referred to in 'section 106,' or 'section 131,' of the Crimes act, then state the exact hour of the day the state will contend at the trial the alleged offense was committed by the said defendant?"

"6. If in answer to the last preceding question, the state will contend at the trial that the death occurred as the result of the defendant's perpetrating or attempting to perpetrate burglary as referred to in 'section 107,' of the Crimes act, then give the hour the state will contend such offense was committed."

Both, as will be seen, postulate a theory of entry in the night time and demand a specification of the hour. The date asserted was June 16th, one of the longest days in the year. In opening, the prosecutor asked a first degree verdict, and specifically on the grounds that the killing was willful, deliberate and premeditated, or that it was in the commission or attempted commission of a burglary, or both. The opening is before us, and in several places reflects this specific thought, viz., of homicide in the perpetration of a burglary; and this as calling for a first degree verdict. Nowhere in the opening, nor in the previous colloquy between court and counsel was there any mention of homicide in the perpetration of a robbery: but after the state rested, defense counsel called for specific answers to the demand for particulars: and on motion of the prosecutor, the court ruled that notwithstanding the previous undertaking by the state to answer two of the paragraphs, none need be answered, and the state would not be limited by its oral undertaking in that behalf, which had been confirmed by court ruling. Counsel for defense properly pointed out that the cross-examination of state witnesses had been materially affected by the original ruling: but the protest was overruled and exception entered. In the course of the charge the court instructed the jury in effect that even though the killing was not perpetrated in the commission of a burglary, still if it was perpetrated in the commission of a robbery, the defendant could be convicted of murder in the first degree.

If the case had been tried throughout on this alternative theory of robbery, the charge in this regard may have been

impregnable, assuming for present purposes that the word "burglary" in sections 106 and 107 refers to the "high misdemeanor" denounced in section 131. But the case was not so tried. Before any juror was called to the book, and again in the formal opening for the state, defendant's counsel was assured that the claim for murder in the first degree rested on (a) homicide in committing a burglary; or (b) homicide willful, deliberate and premeditated. The state elected to put the case on those grounds, separately or together. When the state asked, and the court permitted, the introduction of an additional theory of murder in the first degree after the state's case was in, and the cross-examination of its witnesses had been necessarily restricted to the two theories originally propounded, there was injected a new theory which had previously been omitted, apparently with purpose, and in the course of meeting the demand for particulars; which had not been made apparent during the presentation of the state's evidence, and which left the defendant without the benefit of cross-examination on that new theory. It may be said, and perhaps with justice, that the defense should have gone farther than a protest and exception, and should have asked the recall of witnesses, for further cross-examination: and failing such request, that the error in permitting the new issue—and we think it was an error—was waived. We do not pass upon this point: but at best, and assuming the request had been made and granted, the whole proceeding would still have been a serious blemish upon the orderly conduct of a trial where the life of a human being was at stake, and where, above all other trials, such irregularities should not be allowed to creep in. We may go even farther, and say that the theory of murder in perpetration of a robbery should not have been waived or ignored in the first place. That theory was apparent in the very confession of the defendant in possession of the prosecutor's office, stating facts much as they are stated above: and the case on the facts is closely similar to *State* v. *Lyons,* 70 *N. J. L.* 635, in which the state's theory, endorsed by this court, was that of murder in perpetrating a robbery. A reading of page 645 will make this clear. Hence, the confusion incident to the addition of a

new theory of first degree murder after the state rested, need not, and should not, have arisen.

In the course of the charge, the court instructed the jury, and with the assent of the assistant prosecutor who tried the case, that the state had not sufficiently established willfulness, deliberation and premeditation to come within the purview of that section (*sic*) of the statute. Perhaps it would have been judicious to waive that theory in the first place: but on the evidence as laid before us it seems to have a substantial foundation as a jury question. It was open to them to say that defendant killed the deceased with a weapon potentially deadly at the least, under circumstances of great atrocity and while deceased was defending property placed in his care; that according to the evidence of Dr. Martland, the county medical examiner who saw the body while it was still warm and undisturbed, the head lay in a large pool of blood, face downward, with a clothes truck inverted over it; and that there were nine lacerations of the head, of which five caused skull fractures, any one of which could produce death in a few minutes; and that defendant, according to his own confession, after beating the deceased into insensibility and while he was still faintly moaning, dragged him across the floor and wrapped some clothing around his head, overturned the pushcart over it, went upstairs and washed his hands, wrapped his electric drill in some stolen clothing, put the bundle in a bag, turned out the lights and left the premises.

It is elementary law that homicide with a deadly weapon justifies in itself a presumption that there was an intent to take life. *State* v. *Maioni,* 78 *N. J. L.* 339, 343, 344; 30 *C. J.,* § 350; *Ibid., p.* 292, § 537. A deadly weapon, according to Mr. Bishop, is one liable to produce death or great bodily injury; and in case of doubt, the manner in which it was used may be taken into account in determining whether or not it was deadly. *Bish. Stat. Cr.,* § 320; 2 *New Crim. Law,* § 681. In the cited Missouri case of *State* v. *Drumms,* 56 *S. W. Rep.* 1086, the weapon was a piece of iron gas pipe. In *People* v. *Schmidt,* 168 *N. Y.* 568, it was a hammer, apparently of ordinary type. In that case the skull of deceased had been heavily fractured. The court said (at *p.*

575) : "That he [defendant] killed the deceased by a blow from a deadly weapon upon a vital spot is certain."

In like manner, the weapon used, the time consumed and the circumstances of the killing, may support an inference of deliberation and premeditation. 30 *C. J.* 142, 293; as also the nature, location and severity of the wounds.

Naturally the defendant was not legally harmed by the abandonment of the premeditation theory even if such abandonment was needless. But the situation was awkward and might well have been avoided.

Reverting to the burglary theory, which was one of the two relied on in the charge—if, as we have intimated, homicide in the commission of a robbery was well supported by the evidence, the theory of homicide in the commission of a burglary loses some of its practical importance. That theory raises the troublesome question, never decided in this court, whether the "burglary" mentioned in sections 106 and 107 of the Crimes act is, on the one hand, burglary at common law, viz., the breaking and entering by night into a mansion house with intent to commit a felony (4 *Blk.* 224; 2 *Bish. New Cr. L.,* § 90; 1 *Russell on Crimes* 785), or, on the other, any act denounced in section 131 of the Crimes act, which, it may be noted, does not in its text describe violations as constituting burglary, but merely pronounces them high misdemeanors (though in sections 123 and 129 certain described burnings are declared to be "arson"). This question, never decided in this court has been considered in another phase in the Supreme Court, and adverted to more than once in other cases. See *Conners* v. *State,* 45 *N. J. L.* 340, 346; *Downs* v. *Insurance Co.,* 91 *Id.* 523; *State* v. *Tonghanni,* 96 *Id.* 63; *State* v. *Rosenberg,* 97 *Id.* 430. In *State* v. *Lyons, supra,* burglary was not suggested. In *State* v. *Compo,* 108 *N. J. L.* 499 (at *p.* 501), a conviction of murder in perpetrating a robbery, we quoted section 120 of the Crimes act as defining robbery, and added: "The common law definition of robbery has, notwithstanding, been uniformly approved and followed in cases where homicide has been committed in the perpetration of a robbery," citing the Lyons case (at *p.* 645), where the common law definition

of robbery as stated by the trial court was expressly approved, and the statute (Crimes act, section 120) was not even alluded to. No decision of the point is here intended, as the ground first above treated suffices for a reversal and a new trial. The judgment is, to that end, accordingly reversed.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, PARKER, LLOYD, CASE, BODINE, DONGES, HEHER, PERSKIE, VAN BUS-KIRK, KAYS, HETFIELD, DEAR, WELLS, JJ. 14.