THE STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. EDWIN DANSER, PLAINTIFF IN ERROR.

Argued April 2, 1936—Decided May 14, 1936.

For the State of New Jersey, *William A. W. Grier*.

For the plaintiff in error, *Henry Burt Ware* and *F. Newlin Aclon*.

The opinion of the court was delivered by

Case, J.   Edwin Danser, herein referred to as the defendant, was tried by a jury in the Salem Oyer and Terminer upon an indictment charging him with the murder of his wife, Ada Danser.   He was found guilty in the first degree with recommendation of life imprisonment.   The judgment of conviction is brought before us by defendant on writ of error and also under the one hundred and thirty-sixth section of the Criminal Procedure act.

Defendant and his wife conducted a roadhouse, with filling station and tourist cabins, at a cross-corner of the Harding highway in the township of Upper Penns Neck.   The proofs show, without dispute, that the relations between defendant and his wife had been strained and quarrelsome, largely because of defendant's excessive drinking.   After a short period of abstinence, defendant, on the day preceding the night of the tragedy, took his wife's automobile, rode about the neighboring country, did some drinking and met with a collision which badly damaged the car.   Apparently the decedent was quite angry with the defendant because the latter had resumed his drinking and had had the automobile accident.   There were disputes between the two which lasted into the night.   Deceased went to bed in a small room in the house; defendant, in one of the tourist cabins.   Another of the cabins was occupied by the Hoelin family, tourists from Minnesota.

There is some difference in the testimony as to subsequent events, but the jury would have been justified in finding from the evidence that:   In the early hours of the morning Danser went to the house, rapped on the door and demanded admittance, saying, "we might as well have this out right away;" he entered the house and there was a heated argument in progress when the Hoelins fell asleep; Mrs. Hoelin was awakened sometime later by revolver shots and heard Danser say in an

angry voice, "die, God damn you, die;" there was then a period, estimated at ten minutes, of silence following which Danser was heard to say in a calm voice, "Ada, Ada why did you do this?"; there was no response to this remark and Danser came out, announced that his wife had shot herself, and called a maid who was sleeping in a cabin.

The state police were summoned and took first charge of the inquiry. Mrs. Danser was found lying on the floor of the small bedroom between the bed on which she had been lying and a couch on which Danser admitted he had been sitting after his entry into the house. Mrs. Danser was dead from the wound of a bullet which had entered her chest on the left side about an inch inside the breast nipple line and at about the level of the tenth rib, had traversed her body in a line almost straight back and slightly up and had come to rest under, but not breaking, the skin of her back. The revolver from which the bullet had been fired was lying on the floor. The weapon bore no fingerprints. It contained five chambers, also five shells of which three had been discharged and two were still loaded. A second bullet was found to have gone through the leg of a table at the foot of the bed about three and one-half inches above the floor, and a third to have passed through the doorway into the store and become embedded in the wall about sixteen and one-half inches above the floor.

The defendant's story is that, having been in the same room with his wife, he arose and went into an adjoining room to get a drink of water and that while he was out his wife obtained the revolver and fired the shots. It is in evidence from Wiliam A. Jones, a firearms expert, that the revolver, in firing the fatal shot, must have been held in a straight position, its point of discharge not less than two nor more than four inches from the nightgown which Mrs. Danser wore and that the pressure upon the trigger necessary to produce the revolver action was equivalent to about eight or ten pounds. Dr. Dunn, the physician who performed the post-mortem, testified that the course taken by the bullet was such that, in his opinion, the discharging revolver must have been

in such position that Mrs. Danser could have fired it only by using her thumb in pressing the trigger.

Defendant chooses to encompass his assignments 14 to 16, inclusive, and reasons 1 to 16, inclusive, 18, 18½, 20, 21 and 23 within the proposition that the verdict of murder in the first degree was against the weight of evidence. *Pamph. L.* 1921, *ch.* 349. That point may prevail only when it is clear that the verdict is the result of mistake, passion, prejudice or partiality. *State* v. *Karpowitz,* 98 *N. J. L.* 546; *State* v. *Hauptmann,* 115 *Id.* 412, 443. An examination of the proofs does not disclose any of these disqualifying factors. It is admitted that the decedent and the defendant were the only persons in the house at the time of the shooting. It follows, therefore, under the proofs, that the act either was suicidal or was committed by the defendant. The preliminary quarrels, the cooling period, the unprovoked leaving of his cabin by the defendant at an early morning hour and his entrance into the house with the purpose, announced in anger, of pursuing the dispute to a finality, the hateful words of damnation and death, the course of the bullets other than the one which entered Mrs. Danser's body and of that bullet also, the absence of all fingerprints from the revolver indicating thoughtful care either in the handling of the weapon at and before the firing or in the immediate subsequent removal of marks therefrom—these are among the proofs which place the verdict of deliberate, premeditated killing by the defendant fairly within the field of jury finding.

It is next argued under assignments Nos. 9 to 12, inclusive, in reliance upon *State* v. *Baldanzo,* 106 *N. J. L.* 498, that the court erred in striking the testimony of four character witnesses called by the defendant. The cited case held that one who is otherwise qualified and who has been in such position that he would probably have heard comment had there been such may testify to the reputation of another in the neighborhood where the latter resides even though the witness had heard nothing said; this upon the theory that the more unsullied and exalted the character, the less likely is it ever to be called into question. But it is nevertheless the

community estimate, not the witness' personal opinion, which constitutes reputation. What the witness may think of an individual is not reputation. The following questions addressed to, and answers elicited from, the witness Seehouz and the court ruling thereon are illustrative of the admissions by each of the witnesses and of the rulings by which the testimony was stricken: "*Q*. Is that your personal opinion? *A*. Yes. *Q*. Not the reputation of the man? *A*. No, sir. The court—It may be stricken." We find no error therein.

By the seventh assignment of error it is presented that the court erred in permitting the prosecution to ask of John Johnson, another character witness, whether the witness had ever heard that the defendant had been convicted in the Salem Oyer for the illegal sale of liquor. It was after the witness had replied in the affirmative that the defendant's counsel objected, and the ground stated for the objection was that the question was not sufficiently specific to apprise "the other side" of its nature. The witness appears to have had no difficulty either in understanding or in answering the question. The defense next objected that the incorporation of the name of "any charge" in the question was improper. We fail to understand the significance of this objection, and we receive no enlightenment from the brief. The question was not prejudicial upon either of the grounds stated. As a companion fault the defendant presents under assignment No. 8 that the court permitted the prosecution to ask in the cross-examination of Charles Locuson, another character witness: "If he has committed the things I have just stated to you, do you think the man has a good reputation after those things?" The question in that form was not answered. When the question was finally submitted, it was hypothesized upon what the witness had heard about the defendant's actions and was therefore, we think, within the discretion of the judge on the cross-examination of a witness who had testified to reputation.

Under assignments Nos. 1 and 13 defendant asserts error by the court in permitting the prosecutor to ask of Mrs. Hoelin whether her son had said, at the coroner's inquest and in the defendant's presence, that he had heard the defendant

speak the blasphemous execration at the time of the shooting. Later in the trial the judge, concluding that he had wrongfully permitted the question to stand, struck the testimony admitted thereunder and pointedly instructed the jury, at some length, to disregard it. He said in part:

"Gentlemen, I want to straighten up that testimony that I concluded was erroneously admitted. Ladies and gentlemen of the jury, before we resume and proceed, I want to say that on Tuesday, during the trial of this case, the court permitted Mrs. Hoelin, the lady from Minnesota, to testify that she heard her son, Marvin Hoelin, testify at the coroner's inquest that the defendant, Edwin Danser, had said, immediately after the shooting, 'die, God damn you, die!' This appears on pages 154, 155 and 156 of the typewritten record. This will be ordered stricken from the record and is stricken from the record and you will ignore that portion of Mrs. Hoelin's testimony that deals with the above. She cannot testify to what her son stated at the coroner's inquest. He, the son, should have been brought here to testify if the state deemed his testimony was necessary."

The question to which the defendant objects was put upon redirect following a cross-examination in the course of which the witness had said that both she and her son had heard the disputed words at the time of the shooting. Assuming the admission to have been improper, we think that the question and the reply elicited thereby were so fully eradicated from the case that the admission did not injuriously affect the defendant. *State* v. *Andoloro,* 108 *N. J. L.* 47. See, also, *Bernardsky* v. *Erie Railroad Co.,* 76 *Id.* 580; *Boniewsky* v. *Polish Home of Lodi,* 103 *Id.* 323 (at *p.* 334).

Reasons 4, 5, 6, 10, 13, 14 and 17 are addressed to the court's charge, do not give the language objected to and therefore are improperly before us. *State* v. *Blaine,* 104 *N. J. L.* 325. However, we have considered them (*State* v. *Barth,* 114 *Id.* 112; *State* v. *Burrell,* 112 *Id.* 330, 337), and find no prejudicial error therein.

Assignment No. 24 is faulty in that it presents no judicial action for review; but we have, as has the defendant, asso-

ciated it with assignments Nos. 25, 26, 27 and 28 wherein we are told that the court erred in its charge in that it recited that the state contended thus and so, whereas, according to the defendant's argument, there was no evidence to sustain certain of those contentions. It is not error for the court, in charging the jury, to outline a party's contention. *Eastlack* v. *Mitten,* 109 *Id.* 556, 560. It is, of course, elemental, that the determination of the facts lies exclusively with the jury. The jury were clearly so charged, and nothing to the contrary is brought to our attention. The review of the stated contentions and of the evidence in the case discloses that where the court's remarks may be thought to carry the suggestion that there was proof tending to sustain the state's contention, there actually was proof to which the triers of the fact could give that effect.

The thirtieth assignment of error is to this portion of the court's charge:

"You should consider the fact where it is a fact, that some of the witnesses in this case have been convicted of crime, and to determine whether or not their credibility has been affected thereby, and where it appears that witnesses have made contradictory statements, you should consider that fact and determine their credibility as affected thereby."

We are not sure that we understand the point which the defendant here endeavors to make. He does not assert that none of his witnesses are shown to have been convicted of crime. In the absence of such assertion, we have not searched the voluminous record further in this respect than to ascertain that at least one of defendant's witnesses, namely, Marie Fagan, admitted that she had been convicted of crime. Apparently defendant is leaning upon a supposed rule that the judge may not comment upon the evidence or express the impression made by the testimony in his mind; but such rule does not exist in this jurisdiction. So long as the duty of the jury to decide disputed questions of fact for themselves is pointed out in the charge the judge's comments and expressions of opinion upon the testimony are not assignable for error. *State* v. *Hummer,* 73 *N. J. L.* 714.

Lastly, the defendant, arguing assignments Nos. 17 to 22, inclusive, charges that the court erred in refusing to charge as requested. These assignments, also, were not particularized as required by the rule and are not properly before us; but we have considered them and we find no error therein.

We have taken up all of the argued assignments and reasons and in the order set forth in defendant's brief. Those not argued are abandoned. *Cleaves* v. *Yeskel,* 104 *N. J. L.* 497.

Finding no prejudicial error, we conclude that the judgment below should be affirmed.

BROGAN, CHIEF JUSTICE. (Dissenting.) I am unable to agree with the opinion of the majority on one element of the case under review. The point of dissention concerns the admission of testimony which, although subsequently expunged from the record, with a statement by the trial court to the jury to disregard it, did not eradicate the mischief.

The facts have been set forth in the majority opinion. A crucial point in the case to prove the state of mind of the defendant below at the time the decedent met her death, rested on the testimony of Mrs. Hoelin. She testified that on the night in question she heard the explosion of two shots from the direction of the Danser home and immediately thereafter heard Danser say, "die, God damn you, die." We must assume that the state's attorney knew that her husband, Theodore Hoelin, would not so testify. Every careful prosecutor knows, or should know in advance, what the state's witnesses will offer in the way of proof. She further testified that after a ten-minute silent interval, she heard Danser say, "Ada, why did you do this?"

Now, on redirect examination, the state's attorney, in the person of the assistant attorney-general, asked the witness, Mrs. Hoelin, if her son had not heard the plaintiff in error utter the same savage exclamation. Her son, on the night of the shooting, had been present in the cabin with his father and mother and, over the objection of defense counsel, the court permitted her to say that her son, too, had heard these

words and had so testified at the coroner's inquest. Her son was not present at the trial in the court below, being away in school in Minnesota.

The husband, Theodore Hoelin, testified that after the shots were fired there was an interval of silence and he heard the plaintiff in error say, "Ada, why did you want to do that for?"

It is readily perceived that Mrs. Hoelin, testified to a very incriminating fact and that her husband, with equal opportunity to hear what went on, failed so to testify. Perhaps it might be said that the scale of proof as to this particular was, at that posture of affairs, on this element of the case, evenly balanced. The addition of the hearsay testimony, elicited from the wife, assuredly weighed the scale of proof against the plaintiff in error. True it is that the court instructed the jury to disregard this testimony, saying that he was in error in admitting it, but this instruction to erase that testimony from the case came after it had been firmly imbedded in their minds for three days.

The testimony, we suppose, was admitted on the theory that the defendant below was present at the time that the son gave his evidence before the coroner's jury; that it was not admissible on that theory is too obvious for comment. It was a matter of vital importance to the defendant, was most persuasive on the important element of premeditation and its presentation and the eliciting of it, under the circumstances here exhibited, was a flagrant disregard of the rights of this defendant, on trial in a homicide case. It was assigned as error and indeed if it were not it would be our duty to consider it since the case is before us under the one hundred and thirty-sixth section of the Criminal Procedure act, which requires this court to determine whether or not the plaintiff in error suffered manifest wrong and injury, among other things, in the admission or rejection of evidence. The case of *State* v. *Andoloro,* 108 *N. J. L.* 47, does not seem to sanction the trial court's action in this particular, since in that case the evidence improperly received was forthwith stricken from the record.

Convinced therefore that the circumstance in question caused manifest wrong and injury to the defendant, I am compelled to vote for a reversal of the judgment.

Mr. Justice Heher concurs in these views.

*For affirmance*—THE CHANCELLOR, LLOYD, CASE, BODINE, DONGES, PERSKIE, HETFIELD, DEAR, WELLS, WOLFSKEIL, RAFFERTY, JJ.   11.

*For reversal*—THE CHIEF JUSTICE, HEHER, JJ.   2.