STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
IRVING DONALD PETERSON, DEFENDANT-APPEL-
LANT.

Argued June 2, 1952—Decided June 23, 1952.

*Mr. Carl Kisselman* argued the cause for appellant (*Mr. Harry Adler*, attorney).

*Mr. George H. Stanger*, County Prosecutor, argued the cause for the State (*Mr. Samuel L. Shapiro*, Assistant County Prosecutor, on the brief).

The opinion of the court was delivered by

WACHENFELD, J. This is a capital case in which the jury returned a verdict of guilty of murder in the first degree without a recommendation and it is contended there was error in the charge, the evidence was insufficient to support the jury's verdict, alleging there was no evidence of an intent to take life, and that the verdict was contrary to the weight of the evidence.

The facts are not complicated nor difficult. The decedent, a woman, Walter Lee Herring, was killed at about 1:30 in the morning of August 18, 1951, in a trailer owned by the defendant, Peterson. Death was instantaneous, caused by a bullet from a rifle admittedly belonging to the defendant. The missile entered her body under the right arm pit and lodged itself in her heart.

The defendant, married but separated from his wife for a number of years, in 1943 met the decedent in Florida and, except for short intervals of time, lived with her at various places until July, 1951. They came to New Jersey from Florida in that month and were accompanied by one Felix Bethel, with whom they had been in close association for over two years. All three had lived at the home of the decedent's mother. Having heard that the relationship between Bethel and the decedent had become something more than platonic, the defendant declared: "* * * I was through with her, and that is when she moved off with Mr. Bethel on this farm out there on the lake somewhere." This was about a month before the shooting.

All three were employed locally. The defendant worked at a cannery and as a farm field laborer, as did also Bethel and the decedent. Despite the odd relationship existing, they apparently still were not outwardly unfriendly. On the day of the murder all had worked together, Peterson and the deceased having gone to collect the pay of all three, who met in Bethel's room to apportion amongst themselves the amount to which each was entitled.

They had planned to go into town to see a motion picture show. Bethel changed his mind and the decedent and the defendant went alone in his car. Arriving too late for the picture, they went to a tavern for a few drinks. The defendant then took his companion back to Bethel's one-room apartment and departed to visit a friend. A short time later he returned to the rooming house. Upon being admitted to the room occupied by Bethel and the deceased, he requested her keys to the trailer, stating he intended to get her clothes and bring them to her, but she countered with the suggestion she accompany him for this purpose.

They drove to the trailer, consisting of two rooms, a combination kitchen and living room and a bedroom at the rear. To the right and just behind the doorway was a closet with a door hinged on the right hand side, which, when it swung outward, covered most of the door space. The deceased entered the bedroom while the defendant remained in the front room. While they were removing clothing from a dresser and closet, an argument ensued in which the decedent is alleged to have threatened to kill the defendant. It is suggested the door was open, preventing them from seeing one another at the time.

The State's primary case rested upon two confessions introduced into evidence and oral admissions made by the defendant to the Chief of Police. In the first statement the defendant said:

"I got out [of the car] and opened the door and turned the lights on. She went in the bedroom, pulled out this paring knife and got behind the door, and she told me she wasn't going to move any-

thing out. She said, 'If she couldn't have me nobody else was going to have me.'

She started out and I went and got the rifle, put the cartridge in. She went behind the door and I shot through the door. She went past me and got in the car and I didn't know whether she was going to tear up the car like she done before, and so I fired another shot. She didn't say anything more and I seen her fall over. I sit her back up in the car, and started for the hospital."

The later confession, given the same day, was in greater detail and was in question and answer form. There the defendant stated:

"We went down and opened the door of the trailer and she went in and she opened the closed door, at the same time she pull this knife out and she said she wasn't going to move anything out. Then I reached in the closet and got the gun out, loaded it and shot. She came out and went past me, got into the car and I thought she was going to tear the car up, so I loaded the gun and fired again. Then I left there and took her to the hospital after she fell over."

The defendant's oral statement, made to the Chief of Police of Bridgeton, was testified to by that officer:

"According to Mr. Peterson, in the process of taking these clothes she reached for a paring knife. He reached in the closet, took the rifle from the closet, put a cartridge in it, and shot her. I asked him at that time, 'Did you know you hit her'? He said, 'Yes, I saw her fall.' He then picked her up and took her out and put her in the car and went back down to Bethel's house, and told Bethel, 'I just shot Walter Lee, come down and get her.' Bethel told him, 'That is none of my business. Call the police.' So then he went back, took the rifle, and fired his shot into the side of the car. I asked him why the shot was fired in the side of the car. He said, to support his story to the police that they were riding along the road, that somebody fired a shot at them, whom he didn't know, and hit Walter Lee."

In the trial of the case the main conflict was factual. The defendant's explanation then was: (1) he denied he had loaded the gun before firing the shot, stating the shooting was accidental; and (2) he described the shooting as having occurred when he picked up the rifle along with clothes which had fallen in the bottom of the closet where the weapon was standing.

Counsel for the defendant frankly admits the part of the confession wherein the defendant asserted that, following the firing of the first shot, the deceased walked out of the trailer and got into the car "was obviously an untrue version which the defendant in his panic and fear-ridden mind considered helpful to his unfortunate situation." It was conceded at the trial by both sides that the woman died instantaneously and fell to the floor of the bedroom.

After informing Bethel he had shot the deceased, the defendant returned to the trailer, reloaded the rifle and shot a bullet into the chrome trim on the right-hand door of the car to corroborate the story which he had formulated and which he intended to tell in his defense. He lifted the decedent from the trailer, dragged her to the car, placed her in the front seat and drove away in search of a hospital, finally arriving in Bridgeton where he told his mythical story to the jail guard on duty. Interrogation by the police subsequently produced the confessions already referred to.

The first point argued is the trial court, in charging the jury, committed error when it said:

"But if you believe that the defendant reached for the cartridge, loaded the cartridge and aimed and shot and killed the deceased, then you have a right to believe from the evidence that the killing was done willfully, with deliberation and premeditation."

The gist of the appellant's contention is that this is prejudicial error because it is "confusing, legally unsound, inconsistent with other portions of the charge, an invasion of the province of the jury, and constitutes an unlawful direction to the jury to find a first-degree murder verdict against the defendant." Or again as expressed by the appellant: "Premeditation and deliberation are declared, in effect, to flow automatically from the loading and firing of the gun alone."

The evidence indicates the defendant "reached in the closet, got the gun out, loaded it and shot." The substance of the court's charge on this sequence of acts committed by the defendant was to the effect the jury "had a right to

believe" from the evidence that the killing was done willfully, with deliberation and premeditation. The court did not trespass upon the function of the jury but merely indicated it could find, on the basis of the foregoing evidence, the killing was done willfully, deliberately and with premeditation.

In ascertaining whether or not error was committed, a single sentence may not be extracted and construed without regard to the context of the entire charge. The charge must be read as a whole in the light of a sensible construction to determine its legal worth. *State v. Banusik*, 84 *N. J. L.* 640 (*E. & A.* 1906); *State v. Frank*, 90 *N. J. L.* 78 (*Sup. Ct.* 1917), affirmed 91 *N. J. L.* 718 (*E. & A.* 1918); *State v. Tachin*, 92 *N. J. L.* 269 (*Sup. Ct.* 1919), affirmed 93 *N. J. L.* 485 (*E. & A.* 1919); *State v. Tansimore*, 3 *N. J.* 516 (1950).

The court in its main charge correctly and accurately defined the various degrees of murder and the requisite elements of each. It cast upon the State, in plain, unambiguous language, the burden of proof as required. It so meticulously defined willful, deliberate and premeditated that no complaint is made thereto by the appellant. Under these circumstances and in accord with the law so often expressed, there is little merit to the complaint now made that the charge was confusing, invaded the province of the jury or constituted "an unlawful direction to the jury to find a first-degree murder verdict."

It is next asserted there was error in the following portion of the charge:

"There is a violent difference in the testimony. What the State has developed is either true or not true. The contention of the State and the contention of the defendant both cannot be correct. I do not want to intimate any opinion, but I suggest that you cannot avoid making a finding of fact. I shall put the problem to you squarely, and perhaps brusquely,—either the defendant is lying in those respects, or he is suffering from a lapse of memory, or the State's witnesses are. In brief, the issue is: Who is telling the truth"?

The nub of the objection is that it authorized "the jury to find against the defendant upon an improper issue; it was confusing to the jury and dilated the requirements otherwise charged as necessary for conviction."

It is not only the province of the court but very often its duty to express an opinion respecting the evidence adduced in the case and legal error is not thus committed so long as the court leaves it to the jury to decide the respective factual issues for themselves. Here the court expressly stated it did not even want to intimate its opinion but was of the thought that the problem of making a finding of fact was their responsibility. There is a wealth of authority supporting the position so taken. *State v. Hummer,* 73 *N. J. L.* 714 (*E. & A.* 1906); *State v. Pulley,* 82 *N. J. L.* 579 (*E. & A.* 1911); *State v. Overton,* 85 *N. J. L.* 287 (*E. & A.* 1913); *State v. Dichter,* 95 *N. J. L.* 203 (*E. & A.* 1920); *State v. Randall,* 95 *N. J. L.* 452 (*E. & A.* 1920); *State v. Grace,* 98 *N. J. L.* 341 (*Sup. Ct.* 1922); *State v. Dragone,* 99 *N. J. L.* 144 (*E. & A.* 1923); *State v. Fuersten,* 103 *N. J. L.* 383 (*E. & A.* 1926); *State v. Giampielro,* 107 *N. J. L.* 120 (*E. & A.* 1930); *State v. Hauptmann,* 115 *N. J. L.* 412 (*E. & A.* 1935); *State v. Danser,* 116 *N. J. L.* 487 (*E. & A.* 1936); *State v. Zupkosky,* 127 *N. J. L.* 218 (*E. & A.* 1941).

If any doubt remains, it is dispelled by the general charge in which the court said:

"However, the Court has no power either to decide or to instruct the jury how to decide any question of fact, for the reason that the jury is the sole and exclusive judge of the facts."

Giving the defendant every benefit of the doubt as he is entitled to by law, we are still unable to discern any error committed in this respect.

The appellant's last averment is the verdict was contrary to the weight of the evidence and unsupportable. The appellant argues: "* * * what proof exists in the case that the firing was with intent to do any harm; that it was to do

more than frighten; or that it was to do more than harm without taking life?"

■■ It is elementary law that a homicide with a deadly weapon in itself justifies a factual presumption there was an intention to take life. *State v. Maioni,* 78 *N. J. L.* 339 (*E. & A.* 1909); *State v. Jones,* 115 *N. J. L.* 257 (*E. & A.* 1935). The weapon used, time consumed and circumstances of the killing may support an inference of deliberation and premeditation. *State v. Jones, supra; State v. Pierce,* 4 *N. J.* 252 (1950).

■■ Whether or not the evidence and the conduct of the defendant bespoke an intent to take life was a question of fact to be decided by the jury and was squarely submitted to it for decision. The verdict should not be set aside as against the weight of the evidence except where it clearly appears it is the result of mistake, passion, prejudice or partiality. *State v. Pierce, supra; State v. Goodman,* 9 *N. J.* 569 (1952). *Rule* 1:2–19(a).

We think the jury's verdict was firmly supported by the testimony. Our reasoning in this regard applies also to the last issue raised by the appellant, that there was not sufficient proof of the elements of deliberation and premeditation. The defendant's own version as uttered in his confession is ample foundation for the jury's finding. Reaching in the closet and getting out the gun required time and thought, indicating deliberation; loading the gun necessitated a manual operation, reflecting premeditation; firing the shot at short range spelled out willfulness.

These progressive steps all occurred with the victim only 10 or 12 feet away, constituting a vivid and constant reminder of the ultimate purpose to which they were dedicated.

The inferences and conclusions were for the jury and the decision they made is vindicated by the record. We can discern no error showing the defendant "suffered manifest wrong or injury."

The judgment is affirmed.

WILLIAM J. BRENNAN, JR., J. (dissenting). I vote to reverse and remand for a new trial because I find substantial merit in defendant's contention that the charge was "an unlawful direction to the jury to find a first-degree murder verdict" and improperly invaded "the province of the jury."

The jury was instructed that there is a "difference between an accidental shooting done unintentionally, and a shooting done with deliberation and premeditation and intentionally"; and also that if the killing "was done in a sudden transport of passion or in the heat of passion, and with provocation, it is manslaughter," but if "done in the heat of passion without provocation, it is second degree murder." If the trial judge had stopped at that point and had left to the jury the choice of the proper verdict dependent upon their findings from the controverted facts, I would see no error. He did not do that. His charge continued: "But if you believe that the defendant reached for the cartridge, loaded the cartridge [the gun?] and aimed and shot and killed the deceased, then you have a right to believe from the evidence that the killing was done willfully, with deliberation and with premeditation."

Yet the interval during which the defendant "reached in the closet, got the gun out, loaded it and shot" was seconds at most. The defendant and the deceased were having a bitter quarrel at the time. Concededly a willful, deliberate and premeditated intention to kill the deceased could have been formed by defendant in even that short time. It was equally inferable, however, that the killing was done in a sudden transport of passion induced by the quarrel, and if that was the case the homicide was an offense no greater than murder in the second degree.

The jurors thought that, or at least were uncertain whether, they had been instructed to bring in a verdict of first-degree murder if they found merely that the defendant "reached for the cartridge, loaded the cartridge [the gun?] and aimed and shot and killed the deceased." They made their quandary clear to the trial judge when, after six and one-half hours of

deliberating, they returned and asked, "Does the fact he shot her as the results (*sic*) of an argument alter the first degree murder verdict?" Certainly that question required an answer that the crime was not higher than murder in the lesser degree if the jury found that it was committed in a sudden transport of passion engendered by the quarreling. The judge, however, merely told the jury, "I don't feel I can give a categorical answer of yes or no to that," and then re-read lengthy excerpts from his charge dealing in most general terms with the distinctions among the several classes of homicidal crimes.

HEHER, J., joins in this opinion.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, BURLING and JACOBS—5.

*For reversal*—Justices HEHER and BRENNAN—2.