895 A.2d 405

JENNIFER FITZGERALD, PLAINTIFF–RESPONDENT,
v. STANLEY ROBERTS, INC. AND EDWARD
POMERANZ, DEFENDANTS–APPELLANTS.

Argued October 25, 2005—Decided April 20, 2006.

288

*Carl A. Salisbury* argued the cause for appellants (*Killian & Salisbury*, attorneys; *Mr. Salisbury and Steven R. Weinstein*, on the briefs).

*Maureen S. Binetti* argued the cause for respondent (*Wilentz, Goldman & Spitzer*, attorneys; *Ms. Binetti and Jennifer L. Barnes*, on the brief).

Justice LONG delivered the opinion of the Court.

Plaintiff filed a complaint against her former employer in which she advanced a series of claims arising out of what she categorized as sexual harassment in the workplace. The jury returned a verdict in her favor and the trial judge awarded her attorneys' fees under the Law Against Discrimination ("LAD"), *N.J.S.A.* 10:5–1 to –49. Defendants appealed, challenging a number of

evidentiary rulings that they claimed skewed the outcome of the case, including the trial judge's refusal to allow them to call plaintiff's trial expert as a witness; her exclusion of opinion and reputation testimony regarding plaintiff's character for untruthfulness; her admission of testimony about alleged harassment of other female employees; her admission of office gossip; and her refusal to allow defendants to produce a handwriting expert as part of their attack on plaintiff's credibility. Defendants also challenged the counsel fee award as excessive. The Appellate Division affirmed. Because we agree with defendants that a series of errors infected this trial, we have no confidence that the jury verdict was reached in a legally sustainable fashion. Thus we reverse and remand for a new trial.

## I

The case began in 1999 when plaintiff, Jennifer Fitzgerald, filed a complaint against her former employer, defendant Stanley Roberts, Inc., a flatware importer and distributor, and its president, defendant Edward Pomeranz ("Pomeranz"), alleging that they violated the LAD while she worked for them from 1996 to 1998. Plaintiff claimed that defendants subjected her to a hostile work environment, *quid pro quo* sexual harassment, and retaliatory discharge. In addition, she claimed intentional infliction of emotional distress and assault and battery. Defendants denied all of plaintiff's allegations and a lengthy and hard-fought trial ensued at which extensive evidence was adduced by both sides.

In brief, plaintiff testified that immediately following commencement of her employment, Pomeranz, who was an equal owner of the company with his father, Harold Pomeranz, began a campaign of sexual harassment against her. She claimed Pomeranz carried out his harassment in numerous ways such as making comments about her legs, continuously calling her at home to invite her out on dates, taking her to a massage parlor, and ordering her to take off her clothes and report to his office.

Plaintiff indicated that she was aware of a memo distributed by the company regarding sexual harassment that required notifica-

tion of any such harassment to a supervisor or officer of the company. According to plaintiff, many employees did not take the policy seriously because any complaints about Pomeranz would likely be reported to his father, a person they viewed as unlikely to take any action to remedy the situation. Nonetheless, plaintiff claimed she reported an incident of harassment to Leman Lane, the company's controller, and her employment was terminated less than two weeks later. Lane denied that plaintiff ever complained to him about Pomeranz's behavior or sexual harassment.

According to plaintiff's testimony, at the time she was terminated, Pomeranz informed her that she was "being downsized" and added that she was now free to sleep with him because he was no longer her boss. Plaintiff believed that the company was not downsizing because Lane had hired a second assistant two months earlier. At trial, Lane admitted that a new person was hired several months after plaintiff's termination to do plaintiff's job.

During the trial, plaintiff produced witnesses to testify about gossip involving Pomeranz's volitional sexual relationship with a former employee, T.S. Plaintiff testified that T.S. had admitted engaging in acts of workplace prostitution with Pomeranz. In addition, plaintiff was permitted to introduce testimony by other female employees about Pomeranz's sexual harassment of them.

In seeking damages, plaintiff alleged that she suffered insomnia, fatigue, and an inactive thyroid gland along with a recurrence of symptoms related to the Epstein–Barr virus [1] as a result of defendants' treatment of her. At trial, plaintiff's expert, Dr. Richard Podell, testified that she suffered from chronic fatigue syndrome due to the stress of the harassment.[2]

---

[1] Epstein–Barr virus (EBV) is a member of the herpesvirus family and is the cause of infectious mononucleosis, commonly referred to as "mono." National Center for Infectious Diseases, Epstein–Barr Virus and Infectious Mononucleosis, http://www.cdc.gov/ncidod/diseases/ebv.htm (last visited April 4, 2006).

[2] Dr. Podell also explained the suspected causal relationship between EBV and chronic fatigue syndrome.

Defendants produced witnesses who testified that they had not seen the side of Pomeranz that plaintiff depicted and described the office atmosphere in rather banal terms. For his part, Pomeranz strongly denied the truth of plaintiff's allegations, as well as those made by other women.

Defendants also vigorously attacked plaintiff's credibility. Among other things, they proffered evidence that plaintiff was claiming injuries for which she had recently successfully sued her landlord.[3] Further, defendants pointed out that despite claiming numerous ill effects from the alleged sexual harassment and her subsequent termination, approximately ten days after completing her insurance forms for total disability, plaintiff traveled to Florida where she underwent breast augmentation surgery. Approximately three days after her surgery, plaintiff returned to New Jersey and a few days later went back to Florida for a vacation with her nieces at Disney World.

Defendants produced their own expert, Dr. Paula Bortnichak, regarding plaintiff's alleged damages. Dr. Bortnichak characterized plaintiff's claims as exaggerated and diagnosed plaintiff as suffering from hypokalemia[4] due to the use of diuretics like diet pills and laxatives, rather than chronic fatigue syndrome. Dr. Bortnichak concluded that plaintiff did not suffer from severe depression and was not disabled.

Finally, defendants sought to call Dr. William Nadel, a psychiatrist who had originally been scheduled to testify as plaintiff's expert. Dr. Nadel had modified his initial diagnosis after reviewing information provided during discovery. The trial judge would

---

[3] That lawsuit resulted from a mugging in the parking lot of plaintiff's apartment complex. Plaintiff alleged that the mugging caused her to suffer acute anxiety with depression and intensified symptoms related to EBV. Shortly after plaintiff's termination from Stanley Roberts, the jury in that case awarded plaintiff approximately $65,000.

[4] Hypokalemia is an abnormally low level of potassium. *Stedman's Medical Dictionary* (4th Lawyer's ed.1976).

not permit defendants to call Dr. Nadel based on our decision in *Graham v. Gielchinsky,* 126 *N.J.* 361, 599 *A.*2d 149 (1991). The trial judge also prevented defendants from presenting a handwriting expert to refute plaintiff's testimony, denied by Lane, that Lane had signed her disability form.

The jury returned a verdict in plaintiff's favor on retaliation and hostile work environment sexual harassment but ruled for defendants on *quid pro quo* sexual harassment, intentional infliction of emotional distress, and assault and battery. It awarded plaintiff economic damages of $50,000 and emotional distress damages of $100,000. The trial judge also awarded plaintiff counsel fees of $462,927.15. Defendants appealed and the Appellate Division affirmed.

## II

Defendants argue that *Graham, supra,* 126 *N.J.* 361, 599 *A.*2d 149, is no impediment to their calling plaintiff's testifying expert; that reputation and opinion testimony regarding plaintiff's character was improperly excluded; that false and salacious gossip should not have been admitted at trial; that witnesses should not have been permitted to testify that they too had been sexually harassed by Pomeranz; that defendants' handwriting expert should have been allowed to testify; and that the amount of counsel fees and costs awarded was unreasonable.

Plaintiff counters that *Graham* bars defendant from calling an adversary's trial expert as a witness; that office gossip and the testimony of witnesses who had been harassed by Pomeranz was admissible to show the nature and character of the workplace and to prove a hostile work environment; that opinion and reputation testimony regarding plaintiff's truthfulness was properly excluded because it violated the evidence rules; that the exclusion of defendants' handwriting expert was an affirmable exercise of discretion by the trial judge; and that the award of counsel fees and costs was fully supported by the record.

## III

We turn first to defendants' contention that they should have been allowed to call Dr. William Nadel, a psychiatrist originally retained to testify on plaintiff's behalf. In a preemptive move before trial, plaintiff announced that although she was uncertain whether she would call Dr. Nadel, defendants should be barred from calling him if she elected not to do so.

After reviewing additional evidence in preparation for a deposition, Dr. Nadel had modified his diagnosis to one less favorable to plaintiff. Dr. Nadel's initial report from August 2001 stated that he reached his diagnosis following approximately three hours of interviews with plaintiff and the review of her deposition from 1999, a letter from plaintiff's examining physician, Dr. Podell, and statements from four female co-employees. In his original report, Dr. Nadel stated that he agreed with Dr. Podell that plaintiff was suffering from chronic fatigue syndrome. Dr. Nadel additionally diagnosed major depressive disorder as evidenced by plaintiff's daily depressed mood, diminished interest in formerly pleasurable activities, weight gain, and sleeping difficulties. He further concluded that plaintiff suffered from chronic post-traumatic stress disorder because plaintiff felt that Pomeranz's actions "threat[ened] . . . her physical integrity."

Despite those initial conclusions in plaintiff's favor, Dr. Nadel modified his opinion at his May 2002 deposition, stating that his review of additional materials caused him to withdraw his original diagnosis of major depressive disorder. Dr. Nadel then theorized that, rather than a hostile work environment, plaintiff's conditions may have resulted from hypokalemia and low blood pressure, which are side effects of some of her medication. Dr. Nadel further stated that he might diagnose plaintiff either as suffering from somatization [5] or as a malingerer,[6] but emphasized that his

---

[5] Somatization disorder is a chronic condition in which a person experiences numerous physical complaints that implicate psychological problems rather than

opinion was not definitive. Dr. Nadel based his change in theory, in part, on plaintiff's very similar injury claims in the lawsuit against her landlord, and on plaintiff's trips to Florida, which demonstrated a lack of prolonged bouts of depression.

After some procedural maneuvering that need not be recounted here, defendants proposed calling Dr. Nadel as their own witness.[7] The trial judge held that *Graham* prevented defendants from calling Dr. Nadel because he was originally plaintiff's expert. The Appellate Division agreed.

Defendants contend here that *Graham* only applies to non-discoverable expert testimony which is work product, but not to an expert whose opinion was fully revealed in discovery and who was intended as a trial witness. Plaintiff counters that *Graham* is clear that "exceptional circumstances" are required before a party may call an adversary's expert at trial, irrespective of whether that expert's opinion is discoverable or non-discoverable. The defendants have the better of the argument.

In *Graham, supra,* 126 *N.J.* 361, 599 *A.*2d 149, we detailed the development of the rules insulating consulting experts and their opinions from discovery. That history is a useful starting point for our discussion here. At common law, courts were hesitant to

---

an underlying physical problem. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 446 (4th ed.1994).

[6] Malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms motivated by external incentives, such as obtaining compensation or drugs, avoiding work or military duty, or evading criminal prosecution. American Psychiatric Association, *supra,* at 683.

[7] The record does not reflect whether Dr. Nadel agreed to testify for defendants. If Dr. Nadel had been unwilling to do so, defendants could not have compelled his testimony. *See Graham v. Gielchinsky,* 126 *N.J.* 361, 369, 599 *A.*2d 149 (noting New Jersey in minority of jurisdictions not permitting compulsion of expert testimony); *see also Genovese v. N.J. Transit Rail Operations,* 234 *N.J.Super.* 375, 380, 560 *A.*2d 1272 (App.Div.) (holding opinion of expert may not ordinarily be compelled against expert's wishes), *certif. denied,* 118 *N.J.* 195, 570 *A.*2d 960 (1989).

allow an adversary to discover the opinions of an opponent's expert. *Id.* at 365, 599 *A.*2d 149. Both the attorney-client privilege and the work product rule were developed, in part, to discourage parties from attempting to build their cases by foraging through the fruits of their opponent's efforts. *Id.* at 365–66, 599 *A.*2d 149.

Courts gradually came to recognize, however, that for an adversary to effectively cross-examine an expert, he or she required advance notice of the opposing expert's identity and the substance of his or her opinion. *Id.* at 365, 599 *A.*2d 149. Hence, our court rules have been developed to provide for an orderly system of discovery that protects confidential information yet allows for adequate cross-examination of testifying experts. *Rule* 4:10–2(d) protects the work of consulting experts from discovery:

> A party may discover facts known or opinions held by an expert (other than an expert who has conducted an examination pursuant to *R.* 4:19) who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial only upon a showing of exceptional circumstances under which it is impractical for the party seeking discovery to obtain facts or opinions on the same subject by other means.
>
> [*R.* 4:10–2(d)(3).]

At the same time, the discovery rules require that the substance of a testifying expert's opinion be conveyed to the adversary before trial:

> A party may through interrogatories require any other party to disclose the names and addresses of each person whom the other party expects to call at trial as an expert witness, including a treating physician who is expected to testify.... The interrogatories may also require, as provided by *R.* 4:17–4(a), the furnishing of a copy of that person's report.
>
> [*R.* 4:10–2(d)(1).]

Examination of the expert is also permitted:

> Unless the court otherwise orders, an expert whose report is required to be furnished pursuant to subparagraph (1) may be deposed as to the opinion stated therein at a time and place as provided by *R.* 4:14–7(b)(2).
>
> [*R.* 4:10–2(d)(2).]

In *Graham,* a medical malpractice case, we addressed a gap in the discovery rules: those rules protect a consulting expert's

opinion from discovery but are silent in respect to the use of such evidence at trial if acquired in a manner not described in the rules. *Graham, supra,* 126 *N.J.* at 362, 599 *A.2d* 149. There, the defendant sought to call a consulting physician who had examined the plaintiff and concluded that the defendant's treatment of him did not constitute medical malpractice. *Id.* at 364, 599 *A.2d* 149. The plaintiff, for obvious reasons, decided not call the doctor as a witness at trial and did not designate him as a testifying expert or provide his name or opinion in discovery. *Id.* at 363–65, 599 *A.2d* 149. The defendant obtained the report of that expert through undisclosed means and engaged him to testify. *Id.* at 363–64, 599 *A.2d* 149. The trial judge admitted the testimony, but prevented the defendant from eliciting confidential information from the witness or the fact that the plaintiff had originally engaged him. *Id.* at 363, 599 *A.2d* 149. The Appellate Division affirmed and we granted certification. *Ibid.* The issue before us was whether *Rule* 4:10–2(d)(3) should be construed to prevent an adversary from using that evidence at trial if obtained through some means "other than discovery." *Id.* at 362, 599 *A.2d* 149.

We held that a consulting expert is prohibited from testifying for an adversary at trial absent the same "exceptional circumstances" that would have allowed discovery of that expert's identity and opinion under *Rule* 4:10–2(d)(3). *Id.* at 373, 599 *A.2d* 149. We reaffirm that salutary rule today while adding what to us is implicit in *Graham*—that the rule has no applicability to a testifying witness. Indeed, no party to litigation has "anything resembling a proprietary right" to any witness' evidence. *Cogdell v. Brown,* 220 *N.J.Super.* 330, 334, 531 *A.2d* 1379 (Law Div.1987).

Absent a privilege no party is entitled to restrict an opponent's access to a witness, however partial or important to him, by insisting upon some notion of allegiance. *See Int'l Bus. Machs. Corp. v. Edelstein,* 526 *F.2d* 37, 41–44 (2d Cir.1975); *Gregory v. United States,* 369 *F.2d* 185, 187–88 (D.C.Cir.1966); *Edmund J. Flynn Co. v. LaVay,* 431 *A.2d* 543, 551 (D.C.1981); 8 *Wigmore on Evidence* § 2192 (McNaughton rev. ed.1961). Even an expert whose knowledge has been purchased cannot be silenced by the party who is paying him on that ground alone. Unless impeded by privilege an adversary may inquire, in advance of trial, by any lawful manner to learn what any witness knows if other appropriate conditions the witness alone may

impose are satisfied, e.g., compensation for his time and expertise or payment of reasonable expenses involved....

[*Id.* at 335, 531 *A.2d* 1379 (quoting *Doe v. Eli Lilly & Co.*, 99 *F.R.D.* 126, 128 (D.D.C.1983)).]

By declaring that an expert witness will be produced at trial and providing the expert's identity and opinion to another party, as required by *Rule* 4:10–2(d)(1), the original proponent has waived his claim that the information is privileged. Thus, we hold that access to the testifying witness is allowed and the adversary may produce a willing expert at trial. To the extent that *Deffer v. Shop–Rite Supermkts.*, 332 *N.J.Super.* 540, 753 *A.2d* 1228 (App. Div.2000), suggests otherwise, it is disapproved.

Our conclusion aligns with that reached by the majority of courts that have faced the issue before us. All have determined that discovery rules designed to protect consulting experts do not prevent a party from calling an adversary's expert when that expert has been designated a "testifying expert," even without a showing of exigent circumstances. *See, e.g., Peterson v. Willie*, 81 *F.*3d 1033, 1037–38 (11th Cir.1996) (defendant permitted to call plaintiff's testifying medical expert); *Agron v. Trs. of Columbia Univ.*, 176 *F.R.D.* 445, 449 (S.D.N.Y.1997) (defendant permitted to call plaintiff's testifying psychiatric expert); *House v. Combined Ins. Co. of Am.*, 168 *F.R.D.* 236, 246–47 (D.Iowa 1996) (plaintiff permitted to use defendant's testifying psychiatrist); *Crowe v. Nivison*, 145 *F.R.D.* 657, 657–58 (D.Md.1993) (plaintiff permitted to call defendant's testifying orthopedist); *Loiseau v. Bd. of Tax Review*, 46 *Conn.App.* 338, 699 *A.2d* 265, 268 (1997) (plaintiff permitted to call defendant's testifying appraisal expert); *Broward County v. Cento*, 611 *So.2d* 1339, 1339–40 (Fla.Dist.Ct.App. 1993) (plaintiff permitted to call defendant's testifying medical expert).

The more difficult issue is what limitation, if any, should be placed upon the party who is presenting and questioning his adversary's former expert. In other words, may the party calling

his opponent's prior expert, the so-called "Red Rover" witness,[8] inquire regarding the original retention.

For us, the issue is one of first impression. A few New Jersey cases have addressed the question, either directly or obliquely, and they have come to different conclusions. *Compare Moore v. Kantha,* 312 *N.J.Super.* 365, 377–78, 711 *A.*2d 967 (App.Div.1998) (finding original retention properly concealed from jury where "exceptional circumstances" justified partial use of adversary's expert's deposition), *and Cogdell, supra,* 220 *N.J.Super.* at 336–37, 531 *A.*2d 1379 (holding jury should have opportunity to consider fact that expert was initially consulted by opposing party in judging expert's credibility), *with Graham, supra,* 126 *N.J.* at 372, 599 *A.*2d 149 (noting difficulties inherent in cross-examining former consulting expert), *and Deffer, supra,* 332 *N.J.Super.* at 544–45, 753 *A.*2d 1228 (analyzing *Graham's* concern with cross-examination and barring all use of adversary's testifying expert).

Courts across the country are also divided. Those restricting evidence regarding the original retention of a testifying expert generally hold that the expert's substantive opinion, not his retention, is the heart of the matter; that his or her past relationship with a party is irrelevant to that opinion; that reference to the original engagement tends to unfairly prejudice the party who first hired the expert; and that jurors may give too much credence to the opinion of the Red Rover expert. *See, e.g., Peterson, supra,* 81 *F.*3d at 1037–38 (finding introduction of circumstances of prior retention generally improper); *Agron, supra,* 176 *F.R.D.* at 453 (stating restriction on scope of direct examination eliminates prejudice and is effective limitation when party calls adversary's expert); *Granger v. Wisner,* 134 *Ariz.* 377, 656 *P.*2d 1238, 1242–43 (1982) (noting circumstances of original retention irrelevant to issue of negligence); *Gen. Motors Corp. v. Jackson,* 636 *So.*2d 310,

---

[8] Stephen D. Easton, *"Red Rover, Red Rover, Send That Expert Right Over": Clearing the Way for Parties to Introduce the Testimony of Their Opponents' Expert Witnesses,* 55 *SMU L.Rev.* 1427 (2002).

315 (Miss.1994) (finding prejudice inherent in permitting testimony regarding prior retention of expert would "impede the search for truth").

Courts that allow testimony regarding the expert's prior engagement by an adverse party have generally held that there is no reason to conceal those circumstances from the jury because they are relevant to the determination of the weight and credibility to be accorded the expert's testimony. *See, e.g., Miller v. Marymount Med. Ctr.*, 125 *S.W.*3d 274, 282–83 (Ky.2004) (stating evidence tending to prove objectivity of expert witness not inadmissible per se either because of prejudicial effect or tendency to bolster expert witness' credibility); *Fenlon v. Thayer*, 127 *N.H.* 702, 506 *A.*2d 319, 323 (1986) (noting error in order denying party's inquiry regarding doctor's initial retention because such evidence is pertinent to weight and credibility of expert's testimony); *see also Cento, supra,* 611 *So.*2d at 1339–40 (noting permissibility of inquiry regarding facts of initial retention when expert witness named as trial witness); *Baltimore v. Zell,* 279 *Md.* 23, 367 *A.*2d 14, 17 (1977) (noting permissibility of introduction of lack of history between proponent of testimony and adversary's testifying expert); *Marple v. Sears,* 244 *Neb.* 274, 505 *N.W.*2d 715, 718–19 (1993) (affirming right of injured plaintiff to testify regarding examination by defendant's testifying expert who defendant later attempted to withdraw); *Bd. of Educ. v. Barton,* 617 *P.*2d 347, 350 (Utah 1980) (noting prior employment of expert essential to jury's weighing of his testimony); Easton, *supra,* at 1486 (concluding courts that have excluded original retention evidence do so not because it has too little probative value but because it has too much).

Although we recognize the probative value of this evidence, we also note the unfair prejudice such information may impose on an adverse party. In fact, there are many reasons why a witness, hired as a party's expert, may change his or her original view of the case. The most common is likely a fuller understanding of the science or of the facts. To be sure, that fuller understanding may

come as a result of deliberate withholding of information by the original retaining party, but it may also occur through no fault of that party. For example, the original party may have been misled or mistaken or simply may have omitted a salient fact, innocently misunderstanding its importance. In such cases, the change of sides has nothing whatsoever to do with the adverse party or, indeed, the merits of the case. Yet, as the courts that have refused to allow inquiry regarding the original retention have uniformly observed, the mere change of sides has a powerful negative effect on the jury's evaluation of the party, or the attorney, who originally retained the witness. *See Granger, supra,* 656 *P.*2d at 1242–43 (noting mention of prior retention would lead jury to assume plaintiff's counsel had withheld information from the expert).

Indeed, such prejudice is often the very purpose for which the proffer is made. In this case, defendants stated that one of the specific reasons for calling Dr. Nadel was to impeach plaintiff's credibility by showing that she had not been completely candid about her injuries. Even where a party is not so overt in its attempts to prejudice the adversary, there is a substantial risk that the jury will unfairly assume that the expert changed sides because the original hiring party did something wrong, whether that is the truth or not.

We are likewise concerned that the mere change of sides of the Red Rover witness may lead the jury to view him as something of a super-expert, whether that is warranted or not, and to assess the testimony less critically than would otherwise be the case. In the final analysis, it is the credentials of the expert and the opinion that he renders that should be the critical path to the jury's acceptance or rejection of his view.

■ Thus, taking into account that it is the expert's opinion and not his retention that should be the focus of the jury, and balancing the risk of unfair prejudice to the original retaining party against any incremental enhancement of the Red Rover expert's credibility, we adopt the approach of those courts that

generally restrict inquiry regarding the circumstances of the Red Rover witness' initial retention. *See, e.g., Agron, supra,* 176 *F.R.D.* at 453; *Granger, supra,* 656 *P.*2d at 1242.

That restriction, however, is not absolute. Obviously, that rule will not apply where the original retaining party opens the door, for example, by challenging the qualifications of the expert. In such circumstances, inquiry into the original retention may be necessary because that party will have placed the prior engagement in issue. *See Peterson, supra,* 81 *F.*3d at 1038 n. 5 (attacking expert's qualification on cross-examination may open door to rehabilitation by "eliciting testimony from the witness that the party had thought highly enough of the witness to consult him or her originally"); *Granger, supra,* 656 *P.*2d at 1242 n. 4 (noting inherent difficulty presented in cross-examination where challenge to expert's qualifications may open door to evidence of prior consultation). *But see Agron, supra,* 176 *F.R.D.* at 452 (attacking credentials of expert on cross-examination should not open door to original retention on redirect).

■ We leave it to the trial judge to determine, under the specific circumstances of cross-examination, whether the party, in fact, has opened the door to evidence of the expert's prior retention. If such evidence is admitted, the judge should provide an appropriate limiting instruction to guide the jury's use of it, including a statement to the effect that the change of side, in itself, is no reflection on the adverse party. We have referred that issue to the Committee on Model Civil Jury Charges for creation of an appropriate limiting instruction.

■ In sum, in this case, the trial judge was mistaken in her interpretation of *Graham* and should have allowed Dr. Nadel to testify on defendants' behalf without inquiry regarding the original retention, unless plaintiff placed it at issue.

IV

We turn next to defendants' claims in connection with the disallowance of the reputation and opinion testimony they prof-

fered regarding plaintiff's truthfulness. Before trial, plaintiff filed a motion *in limine* to prevent defendants from offering testimony regarding specific instances of lying by plaintiff and to bar character evidence based on those incidents. In her brief supporting the motion and based on deposition testimony, plaintiff identified a series of "petty and inflammatory" incidents that led her co-workers to believe she was untruthful. Specifically, plaintiff stated:

> Defendants will proffer testimony of its current and former employees in an effort to show that plaintiff is untruthful. For example, defendants will offer testimony of Lee Lane that plaintiff is untruthful because she discussed going to Harvard and UCLA, claimed to have a photographic memory, made bookkeeping errors and claimed to meet a football player whom Lane assumed she had never met.

> Linda Morero is expected to testify that plaintiff is an untruthful person, incredibly, because plaintiff said to her that her hair was natural and apparently Morero believes that plaintiff had hair extensions. Morero admits that there is no other basis for believing plaintiff is untruthful [other than] hearsay. Morero also believes that plaintiff never met the professional football player at issue, which is incorrect.

> James Boffa is expected to testify of his belief that plaintiff is a habitual liar. His sole basis is comments made about UCLA and/or Harvard and her desire to become a CPA.

> Defendants will also call [T.S.] to opine that plaintiff did not have a reputation for truthfulness at Stanley Roberts. Her sole basis for this statement is her petty deposition comments that plaintiff would exaggerate how much she paid for her shoes, women's clothing and jewelry, misstated about the year of the car she was driving, and allegedly lied about her roommate having a health condition which the evidence supports she did indeed have.

> Marlene Cohn will testify that plaintiff is untruthful because plaintiff said she was going to become a CPA. She will also apparently testify that plaintiff said her tires were once slashed and "we never heard anything about that."

> Defense will also offer Diane Ingenito who will apparently testify that plaintiff was an unbelievable person because Jen claimed to have met a professional football player and she did not believe that she had done so. Ingenito will also testify that Jen said she had started a pursuit of a modeling career, and she did not believe that. Defense may also offer testimony of Penny Liguori to show that plaintiff exaggerated about the professional football player.

Plaintiff argued that because those individual incidents were inconsequential, neither evidence of the specific incidents themselves nor character evidence in other forms should be admitted. Specifically, plaintiff stated:

All of the petty and inflammatory aforementioned testimony is excludable pursuant to *N.J.R.E.* 608 which makes specific instances of conduct, offered to prove a trait of character, inadmissible for purposes of effecting the credibility of a witness. Defendants are simply prohibited from calling the aforementioned witnesses to obtain specific instances of alleged occurrences in which they found plaintiff to be untruthful. Therefore, any and all attempts by defendants to prove plaintiff is a liar by specific and petty interpretations of alleged exaggerations is excludable.

Moreover, defendants are prohibited from calling the aforementioned witnesses to give their opinion as to plaintiff's reputation for truthfulness in the community. In order for the defendants to present lay opinion evidence, [there] will have to be some sort of rational basis for the opinion, which is not based on inadmissible hearsay. Moreover, if the court finds that the witness lacks sufficient information to have formed a reliable opinion, the evidence is excludable because of prejudice, confusion, waste of time, or because of lack of personal knowledge.

Defendants responded that their witnesses had interacted with plaintiff for over two years at work and had sufficient information to form a reliable "opinion." Defendants also argued:

The opinions of Fitzgerald's co-workers are relevant to her credibility and her reputation (for being untruthful). This testimony also supports the diagnoses of Dr. Nadel (Plaintiff's expert psychiatrist) and Dr. Bortnichak (Defendants' expert psychiatrist) that Fitzgerald is a malingerer with histrionic personality traits who told untruthful stories and exaggerations, both for financial gain and to draw attention to herself.

Defendants explained their proposed use of the character witness testimony:

I will ask them, do you have [an] opinion as to Miss Fitzgerald's reputation for truthfulness or untruthfulness and they're going to say yes. Now I'm in a catch 22 because [plaintiff's attorney] doesn't want me to ask the next question. What's that opinion based on?

After the trial judge correctly ruled that specific instances of lying would be inadmissible under *N.J.R.E.* 608, defense counsel asked whether it would be permissible to offer "opinion testimony as to [plaintiff's] reputation for truthfulness" *without* inquiring about specific instances. In particular, he stated, "[t]here will be a blanket prohibition on my part. I won't ask anybody about specific instances of conduct relating to truthfulness or not truthfulness." The trial judge replied that such testimony would necessarily lead back to the specific instances of conduct and result in the issue going "round and round." Accordingly, defendants were prohibited from offering that evidence at all.

## A.

*N.J.R.E.* 608 [9] governs the admission of character evidence. The rule states:

> The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, provided, however, that the evidence relates only to the witness' character for truthfulness or untruthfulness, and provided further that evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise. Except as otherwise provided by Rule 609, a trait of character cannot be proved by specific instances of conduct.
>
> [*N.J.R.E.* 608.]

That formulation is repeated in *N.J.R.E.* 405, which provides:

> (a) Reputation, opinion, or conviction of crime. When evidence of character or a trait of character of a person is admissible, it may be proved by evidence of reputation, evidence in the form of opinion, or evidence of conviction of a crime which tends to prove the trait. Specific instances of conduct not the subject of a conviction of a crime shall be inadmissible.
>
> (b) Specific instances of conduct. When character or a trait of character of a person is an essential element of a charge, claim, or defense, evidence of specific instances of conduct may also be admitted.
>
> [*N.J.R.E.* 405.]

■ An opinion witness offers a personal assessment of a prior witness' character based on his or her own perceptions. Biunno, *Current N.J. Rules of Evidence,* comment 3 on *N.J.R.E.* 405 (2005). Contrariwise, a reputation witness restates the community's assessment of the subject's character. *State v. Danser,* 116 *N.J.L.* 487, 491–92, 184 *A.* 800 (1936) ("[I]t is nevertheless the community estimate, not the witness' personal opinion, which constitutes reputation. What the witness may think of an individual is not reputation."); Biunno, *supra,* comment 2 on *N.J.R.E.* 405. To the extent that there is an opinion in the reputation form of character evidence, it is the community's opinion, not that of the testifying witness. *State v. Sinnott,* 24 *N.J.* 408, 420, 132 *A.*2d 298 (1957); *Danser, supra,* 116 *N.J.L.* at 491–92, 184 *A.* 800. The

---

[9] That rule is substantially similar to *Fed.R.Evid.* 608. Unlike the New Jersey rule, however, the federal rule permits broad questioning of all witnesses, including character witnesses, regarding prior instances of conduct on cross-examination. *See Fed.R.Evid.* 608(b).

rules governing the foundation for opinion and reputation evidence are also distinct.

### B.

 Because an individual's testimony regarding another person's character trait is a form of lay opinion evidence, *N.J.R.E.* 701 determines its admissibility:

> If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue.
>
> [*N.J.R.E.* 701.]

*See also N.J.R.E.* 602 (requiring all non-expert testimony be based on first-hand knowledge).

 Thus, a lay opinion regarding a prior witness' bad character for truthfulness will be admissible if it is founded upon the character witness' perceptions of the prior witness and will assist the jury in determining the fact in issue.[10] *See, e.g., United States v. Turning Bear,* 357 *F.*3d 730, 734 (8th Cir.2004) (noting foundation sufficient where character witness knows subject well enough to have formed an opinion). There are no formal prerequisites for the admission of that testimony such as particularly long acquaintance or freshness of information. What is required is sufficient familiarity with the subject to form an opinion.[11] *United States v. Watson,* 669 *F.*2d 1374, 1382 (11th Cir.1982). As under the federal rule, under *N.J.R.E.* 608 "a trait of character

---

[10] Evidence regarding a witness' good character for truthfulness is admissible only after that witness' character for truthfulness has been attacked by, for example, the introduction of opinion or reputation evidence. *N.J.R.E.* 608.

[11] A proper foundation for opinion testimony regarding a prior witness' character for truthfulness may be established by showing the following:

1. The witness is personally acquainted with the subject.
2. The witness knows the subject well enough to have formed an opinion regarding the subject's character for truthfulness.
3. The witness has an opinion of the subject's character for truthfulness.

cannot be proved by specific instances of conduct." Accordingly, at trial, the proponent of a character witness is not permitted to inquire whether the witness knows about any specific instances of conduct to prove the trait in issue.[12] *State v. Guenther,* 181 *N.J.* 129, 140, 854 *A.*2d 308 (2004).

### C.

▇ Unlike opinion testimony that is based on personal knowledge, reputation testimony is hearsay when it is offered for its truth. 5 *Wigmore on Evidence* §§ 1609, 1610 (Chadbourn rev. 1974). *N.J.R.E.* 803(c)(21) provides an exception to the hearsay rule for "[e]vidence of reputation of a person's character at a relevant time among the person's associates or in the community." The theory underlying reputation evidence is that a person's reputation for a particular character trait develops when the community observes specific instances of conduct during its dealings with the person and later discusses that conduct, thereby establishing a general consensus view of the person's character for that trait. *State v. Kelly,* 131 *Vt.* 582, 312 *A.*2d 906, 908 (1973); *see also State v. Micci,* 46 *N.J.Super.* 454, 461–62, 134 *A.*2d 805 (App.Div.1957) (describing theory underlying reputation evidence). The notion of the reliability of that evidence is based on the idea that "the prolonged and constant exposure of a condition of things to observation and discussion by a whole community will ... sift the possible errors and will bring the resulting belief down to us in a residual form of fair trustworthiness." 5 *Wigmore on Evidence* § 1583 (Chadbourn rev.1974).

▇ At common law, in New Jersey and elsewhere, the community from which reputation for a particular character trait could

---

[12] The limitation does not apply at a preliminary examination regarding the qualifications of the opinion witness because that hearing is conducted outside the presence of the jury. Thus specific act evidence may be admitted at such a hearing insofar as it bears on whether the witness possesses sufficient information to be qualified to give evidence of the subject's bad character. *See N.J.R.E.* 104(a); Biunno, *supra,* comment 3 on *N.J.R.E.* 405.

be divined was limited to the place where a person lived. *See, e.g.,* *State v. Brady,* 71 *N.J.L.* 360, 362, 59 *A.* 6 (1904) (noting definition of community must include whole community where subject lived, not a subsection); *Micci, supra,* 46 *N.J.Super.* at 461–62, 134 *A.*2d 805 (allowing reputation evidence from neighboring municipality while stating that community must be one where "the shadow of defendant's daily life is cast"). However, that is no longer the rule in this state, nor in most jurisdictions. *See State v. Johnson,* 216 *N.J.Super.* 588, 606–07, 524 *A.*2d 826 (App.Div.) (permitting evidence of reputation of police informant within community of police officers), *certif. denied,* 107 *N.J.* 647, 527 *A.*2d 467 (1987). Commentators have noted:

> [T]oday it is generally agreed that proof may be made not only of the reputation of the witness where he lives, but also of his repute, as long as it is "general" and established, in any substantial community of people among whom he is well known, such as the group with whom he works, does business or goes to school.
>
> [*McCormick on Evidence* § 44 (3d ed.1984) (footnotes omitted).]

Thus, in order to satisfy the foundation for reputation testimony, what is required is the establishment of the relationship of both the subject and the witness to the relevant community and the existence of an expressed community opinion regarding a trait of the subject's character.[13] Once that occurs, the testimony is admissible.

### D.

 So instructed, it appears that several errors occurred in connection with defendants' proffer of witnesses to testify regarding plaintiff's character for untruthfulness. First, the parties and

---

[13] A proper foundation for reputation testimony regarding a prior witness' character for truthfulness may be established by showing the following:

1. The witness is a member of the same community (residential or social) as the subject.
2. The subject has resided there or been associated with that community for a substantial amount of time.
3. The subject has developed a reputation for truthfulness in that community.
4. The witness knows the subject's reputation for truthfulness in that community.

the judge appeared to conflate opinion and reputation testimony. As we have said, they are discrete methods of challenging character with distinct foundational requirements. Second, the judge mistakenly issued a blanket order barring defendants' character witnesses because she believed that their testimony would be based on specific instances of conduct, despite defense counsel's promise that he would not elicit testimony regarding such specific instances.

█ Significantly, plaintiff advanced no challenge to the character witnesses' familiarity or experience with her; to the notion of the workplace as a cognizable community; to the fact that both plaintiff and the character witnesses were members of the same community; or to the idea that the community had developed a conclusion regarding plaintiff's reputation for truthfulness. Plaintiff's challenge was that defendants' witnesses should be barred from giving testimony regarding her character because they based their conclusions on specific instances of conduct that plaintiff considered inconsequential. That was not a basis to bar the testimony because, in truth, both opinion evidence and reputation evidence are based on individual instances of conduct observed either by the character witness or the community. It is those instances of conduct, sometimes major and sometimes minor, from which the character witness or the community distills an opinion over time. *See Michelson v. United States,* 335 *U.S.* 469, 477, 69 *S.Ct.* 213, 219, 93 *L.Ed.* 168, 174–75 (1948) (defining reputation as "resultant picture of forgotten incidents, passing events, habitual and daily conduct ... a multitude of trivial details") (quoting *Badger v. Badger,* 88 *N.Y.* 546 (1882)). To be sure, evidence regarding specific instances of conduct may not be used to prove a trait of character under either *N.J.R.E.* 405 or 608. What is not barred is the distillate: the opinion and reputation derived from consideration of the specific instances.

█ In this case in which credibility was pivotal, defendants should have been permitted to present both opinion and reputation evidence regarding plaintiff's character for truthfulness without

reference to specific instances of conduct so long as the foundational requirements to which we have adverted were satisfied. It fell to plaintiff to impeach that testimony by attacking, for example, the character witnesses' bias or interest in the case, or by offering character witnesses of her own. The fact that plaintiff's attorney could identify certain instances of plaintiff's misconduct that a defense character witness may have considered does not render the character witness' opinion or reputation evidence inadmissible. In sum, the blanket order barring all of defendants' character testimony was erroneous. In a case like this where credibility was pivotal, we cannot say that that error was harmless.

V

Defendants next contend that the trial judge erred in allowing plaintiff to introduce testimony from co-employees about office gossip to the effect that T.S., a former receptionist at Stanley Roberts, voluntarily performed sexual acts on Pomeranz in his office. Plaintiff claimed that T.S. told her of those acts, and confessed that she performed them for money. Plaintiff also elicited testimony from several co-workers that they had heard speculation that T.S. was performing sex acts in Pomeranz's office. No witness claimed to have observed those acts or, aside from plaintiff, to have heard about them from either of the alleged participants. The following exchange between plaintiff's counsel and plaintiff's witness Ada Mistreski was typical of the manner in which the gossip testimony was presented to the jury:

Q: Did you ever hear work place discussion about a woman named [T.S.]?

A: When I used to go visit?

Q: Yeah.

A: Yes.

Q: And what kind of discussion did you overhear?

A: —no, I was told by another employee like when I would go visit that she would go in his office, and the door would be shut, and they would tell me like what she would be doing in there. Assuming what she would be doing in his office.

Q: What's the name of this employee that told you that?

A: Marlene Cohn.

Q: Okay. And I know this might be a little difficult. I know you're in a room with a bunch of strangers and a Judge even, but can you tell the jury what phrases were used?

A: What Marlene told me she was assuming was going on?

Q: Yes, ma'am.

A: She would say oh I bet [T.S.] is giving him, excuse me, giving him like a [manual sex act] or [oral sex act].

Q: Take your time.

A: And that's what she told me. That's what she's assuming that was happening in there with this [T.S.].

Q: I know you weren't working there at the time, but—

A: No.

Q: —is that something that you think is appropriate in a work place?

A: I don't think it's appropriate in the work place, no.

After a similar set of questions put to another of plaintiff's witnesses Roseanne Leone, plaintiff's attorney continued:

Q: Okay. How did you feel as a female employee of Stanley Roberts to hear this discussion in the office?

A: Disgusted.

Q: Why?

A: Well, I don't think it's the proper place for something like that. You know, it's worse that he was—had a relationship—even if he had a relationship with her, she shouldn't be coming into the office to be doing this and everybody in the office knowing it.

Q: How about the fact that there was these discussions happening. Did that bother you?

A: Yeah. Yes, because it distracted everybody from their work, number one, and it was just—it was making fun of her and I said—and she knew this. She knew as soon as she walked through the door that everybody would be talking about it. I just couldn't believe that somebody could just do that.

As the above colloquy reveals, the witnesses often appeared confused over whether plaintiff's counsel was inquiring regarding the truth of the alleged rumors or of their mere existence.

## A.

 In common usage, gossip is idle talk or rumor, especially about the personal or private affairs of others. *Random House Webster's Unabridged Dictionary* (2d ed.1987). Because gossip consists of out-of-court statements, when it is proffered in a

judicial proceeding to establish the truth of the matter asserted, it is generally inadmissible because it violates the hearsay rule. *N.J.R.E.* 801(c) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."); *N.J.R.E.* 802 ("Hearsay is not admissible except as provided by these rules or by other law.").

Underlying the exclusion of hearsay is the basic principle that unless a specific hearsay exception recognizing the trustworthiness of some otherwise inadmissible out-of-court statement applies, such "untrustworthy and unreliable" evidence should not be admitted in a judicial proceeding. *See State v. Williams,* 169 *N.J.* 349, 358–60, 777 *A.*2d 919 (2001) (discussing statement against interest exception). Indeed, courts "must be particularly assiduous to enforce the hearsay rule in sexual harassment cases in order to protect the privacy both of alleged victims and alleged harassers against scurrilous rumors (designed to coerce either settlement or abandonment of the suit) regarding their sex lives." *Minor v. Ivy Tech State Coll.,* 174 *F.*3d 855, 857 (7th Cir.1999).

However, gossip, like other hearsay evidence, may be admissible if it is adduced not for its truth, but for another purpose, for example, its effect upon a listener. *Spragg v. Shore Care,* 293 *N.J.Super.* 33, 57, 679 *A.*2d 685 (App.Div.1996); *Russell v. Rutgers Cmty. Health Plan, Inc.,* 280 *N.J.Super.* 445, 456–57, 655 *A.*2d 948 (App.Div.), *certif. denied,* 142 *N.J.* 452, 663 *A.*2d 1359 (1995). Thus, if an employee heard gossip that people who complained about work conditions were fired, the evidence might be admissible not to prove that people were in fact fired, but to explain her delay in reporting a problem.

Plaintiff argues that the gossip about Pomeranz and T.S. was admissible because it was offered not to prove its truth but for other legitimate purposes. For example, she contends, among other things, that the evidence was admissible to show the accuracy of her understanding of Pomeranz's actions as sexually harass-

ing; to rebut the effectiveness of a sexual harassment policy; and to establish the character of the workplace.

■ Because Pomeranz's alleged harassment of plaintiff involved unambiguous actions like assault and battery, surprise trips to massage parlors, and instructions to remove her clothes and report to his office, the gossip evidence was of limited probative value, if any, regarding plaintiff's subjective understanding of Pomeranz's other actions. *See Spragg, supra,* 293 *N.J.Super.* at 57, 679 *A.*2d 685.

■ However, the evidence that people gossiped about sexual matters was relevant to establishing the general character of the workplace, to the effectiveness of the sexual harassment policy, and to rebutting witness testimony offered by defendants that the atmosphere of the office was subdued. *See Oncale v. Sundowner Offshore Servs.,* 523 *U.S.* 75, 81–82, 118 *S.Ct.* 998, 1003, 140 *L.Ed.*2d 201, 208 (1998) (stating "real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships"); *see also* Michael J. Frank, *The Social Context Variable in Hostile Environment Litigation,* 77 *Notre Dame L.Rev.* 437 (2002) (noting importance of examining allegedly harassing behavior in light of social context and workplace culture). In other words, although the evidence was inadmissible to prove that Pomeranz, in fact, had a sexual relationship with T.S., it was admissible for some other non-hearsay purposes. That is the nub of the case.

B.

■ When evidence has both an impermissible and a permissible purpose, a jury instruction in respect of the limitations on its use is essential. *Spragg, supra,* 293 *N.J.Super.* at 57, 679 *A.*2d 685; Biunno, *supra,* comment 2 on *N.J.R.E.* 105. If a party fails to request such an instruction, the decision is reviewed under the plain error standard—was it "clearly capable of producing an

unjust result." *R.* 2:10–2; *State v. Macon,* 57 *N.J.* 325, 336, 273 *A.*2d 1 (1971).

■ In this case, although defendants objected to the gossip evidence as inadmissible hearsay, they did not press the issue of a limiting instruction. We choose to address the matter, however, because it is "central to a correct resolution of the controversy and justice requires that we consider it." *In re Howard D. Johnson Co.,* 36 *N.J.* 443, 446, 177 *A.*2d 756 (1962). In doing so, we apply the plain error standard. *See R.* 1:7–5 ("[A]ny error of such a nature as to have been clearly capable of producing an unjust result, even though such error was not brought to [the court's] attention by a party.").

Here, extensive gossip about the purported relationship between Pomeranz and T.S. was elicited by plaintiff. Her counsel repeated the most salacious aspects of that gossip from her opening statement through to her summation. One ten-page section of trial transcript reflects plaintiff's counsel's use of a slang term for fellatio (referring to the gossip) fifteen times. Most egregiously, in plaintiff's summation, she argued that the gossip was actually true. In other words, she asked the jury to misuse the hearsay evidence. Without a proper instruction, the jury had no way to know the limits our law places on the consideration of that evidence. As we have noted, even the witnesses themselves were confused over whether plaintiff's inquiry involved the contents or mere existence of the gossip. Concomitantly, we have no way to know whether the jury, in fact, used the gossip evidence properly or as an indication of Pomeranz's bad character or predisposition to sexually harass his employees. Likewise, because the judge did not underscore the interdiction against considering the gossip as true, we cannot know whether the jurors in fact considered its truth as buttressing the credibility of plaintiff regarding T.S.'s alleged confession to workplace prostitution with Pomeranz. Given that credibility was at the heart of the case, the unlimited gossip evidence was clearly capable of producing an unjust result. *R.* 2:10–2.

■ We reiterate here what should be obvious—where evidence has both an admissible and inadmissible purpose, and especially where it involves "scurrilous rumors" with powerful prejudicial effect, the trial judge must be "particularly assiduous to enforce the hearsay rule." *Minor, supra*, 174 *F*.3d at 857. That necessarily implicates a clear and unequivocal instruction regarding the uses to which the evidence may and may not be put.

## VI

Defendants next claim that other female employees should not have been allowed to testify that Pomeranz sexually harassed them. In particular, defendants argue that because several of plaintiff's co-employees testified to instances of sexual harassment plaintiff may not have witnessed and of which she was not aware during her tenure at Stanley Roberts, that testimony could not be used to prove the existence of a hostile work environment.

■ It is well established that a reviewing court grants substantial deference to the evidentiary rulings of a trial judge. *DeVito v. Sheeran*, 165 *N.J.* 167, 198, 755 *A*.2d 1147 (2000) (citing *State v. Morton*, 155 *N.J.* 383, 453, 715 *A*.2d 228 (1998)). Here, the gossip evidence was not admissible to prove defendant's propensity to harass women or as evidence of his general bad character. *N.J.R.E.* 404; *N.J.R.E.* 405. Like all evidence of prior bad acts, that evidence had a strong potential to prejudice the defendant in the mind of the jury. *See N.J.R.E.* 403. Although harassment of other women witnessed by plaintiff may contribute to her experience of a hostile work environment, harassment of which a plaintiff is entirely unaware cannot contribute to that environment because plaintiff does not experience it. *See Lehmann v. Toys 'R' Us*, 132 *N.J.* 587, 610–11, 626 *A*.2d 445 (1993) (stating, "[a] woman's perception that her work environment is hostile to women will obviously be reinforced if she witnesses the harassment of other female workers").

The trial judge correctly instructed the jury with respect to the use of the evidence as proof of a hostile work environment:

> The plaintiff need not personally have been the target of each or any instance of offensive or harassing conduct for you to find that the working environment was sexually 'hostile. You may consider evidence of offensive or harassing conduct directed toward other workers, *if the plaintiff personally witnessed that conduct.*

Defendants argue that that instruction was insufficient and that the testimony should have been barred altogether. However, that was not possible. At trial, the effectiveness of Stanley Roberts' sexual harassment policy was potentially in issue. Moreover, defendants produced witnesses who stated that there was no problem with sexual harassment at the firm. Evidence of harassment of other women was relevant on both issues. *See Gaines v. Bellino,* 173 *N.J.* 301, 313–14, 801 *A.*2d 322 (2002) (plaintiff permitted to challenge defendant's claim to an effective anti-harassment policy); *Payton v. N.J. Tpk. Auth.,* 148 *N.J.* 524, 536, 691 *A.*2d 321 (1997) (employers liable for their own negligence in failing to institute effective anti-harassment policy); *Lehmann, supra,* 132 *N.J.* at 621–22, 626 *A.*2d 445 ("plaintiff may show that an employer was negligent by its failure to have in place well-publicized and enforced anti-harassment policies").

Additionally, such evidence may have been relevant to show the motive or intention of Pomeranz regarding plaintiff's retaliation and *quid pro quo* harassment claims. *Hurley v. Atl. City Police Dep't,* 174 *F.*3d 95, 102 (3d Cir.1999) (LAD case), *cert. denied,* 528 *U.S.* 1074, 120 *S.Ct.* 786, 145 *L.Ed.*2d 663 (2000). Because the evidence here was admissible for some purposes but not for others, to the extent that it is admitted on remand, a detailed instruction regarding the jury's permitted and non-permitted uses of it should be given upon defendant's request. *See N.J.R.E.* 105.

## VII

We turn finally to the handwriting analysis issue. Leman Lane denied that he ever signed plaintiff's disability insurance forms although plaintiff and her mother testified that they saw him sign them. Defendants sought to admit the testimony of John Paul Osborn, a handwriting expert, who would have testified that Lane's signatures on plaintiff's insurance forms were probably

forged (he could not testify that they were definitively forged because he did not have the original writings to compare). The trial judge excluded that testimony on the ground that it would take an excessive amount of time, and would result in a "little forgery trial within the sexual discrimination trial." We defer to the trial judge's exercise of discretion in excluding the testimony under *N.J.R.E.* 403. *Guenther, supra,* 181 *N.J.* at 155, 854 *A.*2d 308 (stating trial courts well-qualified to determine when admission of evidence will result in "mini-trial" and to bar its admission due to confusion or waste of time). However, if this issue arises on remand, the trial judge should require and consider complete proofs to inform the balancing determination required under *N.J.R.E.* 403.

## VIII

In light of the errors to which we have adverted (the exclusion of Dr. Nadel, the barring of the opinion and reputation witnesses, and the admission of the gossip evidence without a limiting instruction) we have no confidence that the jury verdict in this case was reached in a legally sustainable way. The decision of the Appellate Division is therefore reversed and the judgment entered upon the jury verdict is vacated. The matter is remanded for a new trial to be conducted in accordance with the principles set out in this opinion. This ruling makes it unnecessary for us to address defendants' counsel fee argument.

Chief Justice PORITZ and Justices LaVECCHIA, ZAZZALI, and RIVERA–SOTO join in Justice LONG's opinion. Justice WALLACE filed a separate concurring opinion. Justice ALBIN did not participate.

Justice WALLACE, JR., concurring.

I concur in the result. I part company with the majority's holding that it was error to prohibit defendants from using plaintiff's expert as a witness.

In *Graham v. Gielchinsky,* 126 *N.J.* 361, 599 *A.*2d 149 (1991), we addressed a similar issue. There, the plaintiff consulted Dr. Frederick Primich, who found no negligence had occurred in the course of the defendant's treatment of the plaintiff. *Id.* at 364, 599 *A.*2d 149. The plaintiff consulted a second expert, Dr. Joseph Silva, who concluded that the defendant had been negligent in his treatment of the plaintiff. *Ibid.* The defendant somehow obtained Dr. Primich's report and asked him to testify for the defendant. *Ibid.* The plaintiff's motion to bar the testimony of Dr. Primich was denied. *Id.* at 362–63, 599 *A.*2d 149. A divided Appellate Division affirmed. *Id.* at 365, 599 *A.*2d 149.

On appeal as of right to this Court, we noted that our *Rule* 4:10–2(d)(3), which permits discovery of opinions of non-testifying experts a party consulted in preparation for litigation in exceptional circumstances, did not answer "whether a litigant may use that information at trial when obtained through means *other* than discovery." *Id.* at 365, 367, 362, 599 *A.*2d 149. We sought to balance (1) the interests of truth that favor admission of all relevant evidence bearing on the disposition of the case and (2) "an unavoidable element of unfairness [that] exists in admitting" certain evidence. *Id.* at 371–72, 599 *A.*2d 149. We reasoned that

[b]ecause effective cross-examination of such witnesses is inherently limited, truth has a better chance to emerge if the use of an adversary's expert is the exception, not the rule. Hence, we hold that in the absence of exceptional circumstances, as defined under *Rule* 4:10–2(d)(3), courts should not allow the opinion testimony of an expert originally *consulted* by an adversary.

[*Id.* at 373, 599 *A.*2d 149 (emphasis added).]

We left further evaluation of the competing policy concerns to our Civil Practice Committee but stated that "[p]ending further refinement of the rule, in the absence of 'exceptional circumstances' courts should not admit such evidence." *Id.* at 374, 599 *A.*2d 149.

Our Appellate Division applied the *Graham* rule in *Deffer v. Shop–Rite Supermarkets Inc.,* 332 *N.J.Super.* 540, 753 *A.*2d 1228 (App.Div.2000). With only one defendant remaining in the case, the defendant subpoenaed the plaintiff's expert, Dr. Ira Roschelle. *Id.* at 543, 753 *A.*2d 1228. Dr. Roschelle had prepared an expert

report concluding that several doctors had "deviated from the accepted standards of care in their treatment of the decedent." *Ibid.* Dr. Roschelle's deposition had previously been taken, and the defendant had retained Dr. Andrew Newman as its expert. *Ibid.* The plaintiff informed the defendant he did not intend to call Dr. Roschelle as a witness because his testimony was unnecessary with the other defendants no longer in the case. *Ibid.* The plaintiff's motion to quash the defendant's subpoena to Dr. Roschelle was denied. *Id.* at 543–44, 753 *A.*2d 1228.

The Appellate Division granted the plaintiff's motion for leave to appeal and reversed. *Id.* at 542, 753 *A.*2d 1228. The panel noted that the defendant had retained its own expert to testify at trial and still intended to use that expert. *See id.* at 544, 753 *A.*2d 1228. Citing *Graham,* the court determined that an inherent problem exists "when an adverse party is permitted to call the expert engaged by the [opposing counsel]." *Ibid.* Although the court acknowledged the legal system's desire to find the truth, the panel found "no more guarantee that the truth lies in [the plaintiff's expert's] opinion than in [the defendant's expert's opinion]." *Id.* at 545, 753 *A.*2d 1228. The court noted that similar to *Graham,* "under [*Federal Rule of Civil Procedure*] 26(b)(4)(B), upon which our rule is modeled, the situation in which the exceptional circumstances standard is met is a rare one." *Ibid.* The panel concluded that the high burden of demonstrating exceptional circumstances "promotes fairness by 'precluding unreasonable access to an opposing party's diligent trial preparation.' " *Ibid.* (quoting *Durflinger v. Artiles,* 727 *F.*2d 888, 891 (10th Cir.1984) (citation omitted)).

In the present case, I find no sound reason to distinguish between applying an exceptional circumstances test for non-discoverable expert testimony and allowing the testimony of an opposing party's expert who was deposed, as in the present case. In either circumstance, there is no greater likelihood that the opposing party's expert is more truthful than the adversary's expert. In both situations, a party should be required to demon-

strate exceptional circumstances before being permitted to call an expert originally retained by an adversary.

To be sure, in limited circumstances "trial surprise or other unfairness will require that such expert opinion evidence be allowed." *Graham, supra,* 126 *N.J.* at 374, 599 *A.*2d 149. Here, the testimony of defendant's expert was not substantially different from the anticipated testimony defendant sought to be obtained from plaintiff's expert. Simply stated, defendant failed to demonstrate exceptional circumstances.

Because I find no abuse of discretion in the trial court's ruling that prohibited defendants from calling plaintiff's expert at trial, I would affirm on that issue.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, WALLACE, and RIVERA-SOTO—6.

*Opposed*—None.